OPINION
{¶ 1} Plaintiff-appellant, Laurie Mowery ("Mowery"), appeals from the judgment of the Franklin County Court of Common Pleas in favor of defendants-appellees, City of Columbus ("City") and Lieutenant Arthur Wiley ("Lt. Wiley") (collectively, "appellees"), on Mowery's claims of racial discrimination, racial harassment, retaliation, constructive discharge, and intentional infliction of emotional distress. For the following reasons, we affirm.
 {¶ 2} On November 9, 1998, the City hired Mowery, a Caucasian female, as a civilian Data Entry Operator in the Department of Public Safety's Fire Prevention Bureau, Permits Section. Mowery was subject to a 270-day probationary period. At the time of her hire, Mowery's chain of command was as follows: Lt. Wiley, Captain Paul Crist, Battalion Chief Jerry Mason, Assistant Chief John Rees, and Fire Chief Stephen Woltz. Within a few months after the commencement of Mowery's employment, Captain Wesley Fullen replaced Captain Crist, who retired. Lt. Wiley and Captain Fullen are African-American; Battalion Chief Mason, Assistant Chief Rees, and Fire Chief Woltz are Caucasian. In addition to Mowery, three other employees reported to Lt. Wiley: Elizabeth Waddell, Juanita Williams, and Crystal McCoy.[1] Waddell and Williams are African-American, and McCoy is Caucasian. In early 1999, Battalion Chief Robert Coles, who is African-American, replaced Battalion Chief Mason. In February 2000, Lieutenant Lawrence Stevens replaced Lt. Wiley as Mowery's direct supervisor. Lt. Stevens' race is not clear from the record on appeal.
 {¶ 3} Mowery alleges that, shortly after Captain Fullen and Chief Coles joined her chain of command, her African-American co-workers began making offensive racial comments, including that things would be different with a black chief, that they wanted an all-black department, and that they hated white people. Mowery also testified that her co-workers would audibly comment on newspaper articles, blaming arrests of African-Americans on Caucasians. Mowery claims that she reported such comments to Lt. Wiley.
 {¶ 4} In February or March 1999, Mowery began receiving racial literature, which she found offensive and upsetting, in her employee mailbox. Mowery received documents entitled "On the Invisibility of Privilege" and "Let's Make a Slave — Speech of Willie Lynch 1712." Mowery and McCoy, who had also received the racial literature, complained to Lt. Wiley and Captain Fullen. Mowery and McCoy also complained to Battalion Chief Mason, who instructed them to take their concerns to Chief Coles. During a meeting of the permits section staff on March 18, 1999, Mowery and McCoy brought their concerns regarding the racial literature to Chief Coles' attention. Chief Coles explained that he would not tolerate the inappropriate distribution of racial literature and stated that he would take disciplinary action against the individual responsible for distributing it. Chief Coles requested an investigation by the Professional Standards Unit, which resulted in the non-supervisory employee responsible for distributing the literature receiving a 240-hour suspension. On April 28, 1999, Chief Coles held a meeting for the entire Fire Prevention Bureau to address the racial issues that McCoy and Mowery had raised. Eventually, the distribution of racial literature to Mowery's work mailbox ceased, although Mowery sometimes saw similar literature on Waddell's desk.
 {¶ 5} After Chief Coles' meeting, Mowery claims that her African-American co-workers would not speak to her and increasingly subjected her to racial jokes, remarks, and criticisms. Mowery asserts that her co-workers would congregate at the front desk and, although she was not part of their conversations, speak at a volume audible to her. Neither Lt. Wiley nor Mowery's co-workers ever personally called Mowery a name based on her race. Nevertheless, Mowery asserts that the constant racial comments made it difficult for her to work and feel comfortable in the office.
 {¶ 6} On April 21, 1999, Mowery and McCoy requested permission to meet with the City's Equal Employment Opportunity ("EEO") Office on April 23, 1999. Lt. Wiley initially refused the request, but subsequently agreed to allow Mowery and McCoy to visit the EEO office separately. Wishing to attend the EEO meeting together, Mowery and McCoy rescheduled their appointment, and, on April 26, 1999, Mowery requested permission for her and McCoy to meet with the EEO office on April 29, 1999. Lt. Wiley signed Mowery's request after requiring her to re-write the request four times.
 {¶ 7} On April 22, 1999, the day after Mowery first requested permission to meet with the EEO office, Lt. Wiley completed Mowery's first probationary Performance Appraisal (the "appraisal"). In six of seven categories, Lt. Wiley rated Mowery as "Development Needed," the second lowest of four possible ratings. In the seventh category, Lt. Wiley rated Mowery as "Fully Competent," but noted that the parameters of that category were not part of Mowery's job description. The following day, Mowery submitted a written response to the appraisal, contesting Lt. Wiley's observations and ratings. Based on the appraisal, Assistant Chief Rees and Fire Chief Woltz recommended termination of Mowery's employment. Fire Chief Woltz later rescinded his recommendation, and Mowery was not terminated because of her appraisal.
 {¶ 8} On May 24, 1999, Mowery filed a discrimination complaint with the City's EEO office ("EEO Complaint"), claiming that appellees treated her differently from her African-American co-workers based on her race. Mowery's EEO Complaint contained allegations regarding the racial literature, her co-workers' racial comments, and allegations of disparate treatment. Mowery also alleged that her negative appraisal constituted retaliation for contacting the EEO office. In support of her retaliation claim, Mowery also made allegations concerning Lt. Wiley's refusal to allow Mowery and McCoy to visit the EEO office together on April 23, 1999, and Lt. Wiley's requirement that she re-write her request to attend the re-scheduled EEO appointment four times.
 {¶ 9} In support of her disparate treatment claim, Mowery alleged that Lt. Wiley permitted Williams to use a vacation day when she called off work, but told Mowery that use of vacation time required pre-approval. Mowery also claimed that, while other employees did not sign in and out for lunch and took long lunches, Lt. Wiley closely scrutinized Mowery's time, including her lunch period. Mowery claimed that Lt. Wiley permitted Williams and Waddell to park in unassigned spaces behind the building, but required her and McCoy to park in front of the building, further from the entrance. Mowery claimed that she received a memo of counseling on April 8, 1999, for failing to follow her chain of command, but that Williams received no such counseling for the same conduct. Mowery also claimed that Lt. Wiley denied a request she had made to visit the civil service office, but permitted an African-American temporary employee to visit that office.
 {¶ 10} After conducting an investigation of Mowery's complaint, the EEO office issued a report on November 1, 1999, concluding that probable cause existed for Mowery's claims of disparate treatment, racial harassment, and retaliation ("EEO Report").[2]
 {¶ 11} Mowery's affidavit sets forth other allegations of harassment and discrimination by Lt. Wiley. Mowery states that Lt. Wiley enforced a sign-in policy only against her, monitored the time she took for lunch, and yelled at her if she failed to sign in or out. Mowery also states that Lt. Wiley hassled her about the status of work projects and would give her inconsistent instructions and then yell at her for failing to follow orders. Mowery asserts that Lt. Wiley would come close to her face and scream at her in the presence of African-American, male firefighters.
 {¶ 12} Lt. Stevens assumed supervision of Mowery in February 2000. Mowery asserts that Lt. Stevens continued Lt. Wiley's pattern of treating her differently from her African-American co-workers. However, Mowery testified that Lt. Stevens never said anything to her about her race, never called her names, never screamed at her, never raised his voice to her, and never disciplined her. In her deposition, Mowery testified that Lt. Stevens was cordial to her and that, if she had questions about her work, Lt. Stevens would get the answers she needed. Mowery further stated that, when she complained to Lt. Stevens about her co-workers' racial comments, he would require employees to move away from the front desk, where they congregated. Mowery was not disciplined and did not file any grievances while under Lt. Stevens' supervision.
 {¶ 13} From February 2000 to April 2000, Mowery testified that neither Chief Coles nor Captain Fullen screamed at her, raised their voices to her or called her names. During this same period, Lt. Wiley no longer screamed at Mowery.
 {¶ 14} In April 2000, Mowery took medical leave. As of May 23, 2000, Mowery's work excuse from her physician expired, but Mowery failed to return to work. On May 25, 2000, the City advised Mowery that she was absent without leave and informed Mowery that she could apply for leave under the Family Medical Leave Act of 1993 ("FMLA"). Although the City sent her the necessary paperwork to apply for FMLA leave, Mowery did not do so, and she submitted her resignation on June 14, 2000.
 {¶ 15} Mowery first filed her claims in the Franklin County Court of Common Pleas in September 2000, in case No. 00CVH09-8714, but subsequently dismissed those claims. On March 4, 2003, Mowery re-filed her claims of racial discrimination and harassment, retaliation, constructive discharge, and intentional infliction of emotional distress. On March 3, 2004, the trial court granted appellees' motion for summary judgment as to Mowery's claims of racial discrimination, retaliation, constructive discharge, and intentional infliction of emotional distress and denied appellees' motion for summary judgment as to Mowery's claim of racial harassment. Mowery's racial harassment claim proceeded to trial, and a jury returned a verdict in appellees' favor. On February 14, 2005, the trial court issued its final judgment entry, dismissing all of Mowery's claims with prejudice.
 {¶ 16} Mowery timely appealed and asserts the following assignments of error:
1. The trial court erred in granting partial summary judgment to defendants-appellees City of Columbus and Arthur Wiley as to plaintiff's-appellant's claims for racial discrimination, retaliation, constructive discharge and intentional infliction of emotional distress.
2. The trial court erred by refusing to admit into evidence the City's EEO Report regarding the racial discrimination suffered by plaintiff-appellant.
3. The jury's verdict was against the manifest weight of the evidence.
 {¶ 17} Mowery's first assignment of error concerns the trial court's disposition of appellees' motion for summary judgment. Mowery argues that the trial court erred by granting appellees' motion with respect to her claims for racial discrimination, retaliation, constructive discharge, and intentional infliction of emotional distress.
 {¶ 18} Appellate review of summary judgments is de novo.Koos v. Cent. Ohio Cellular, Inc. (1994), 94 Ohio App.3d 579,588, citing Brown v. Scioto Cty. Bd. of Commrs. (1993),87 Ohio App.3d 704, 711. When an appellate court reviews a trial court's disposition of a summary judgment motion, it applies the same standard as the trial court and conducts an independent review, without deference to the trial court's determination. Maust v.Bank One Columbus, N.A. (1992), 83 Ohio App.3d 103, 107; Brown
at 711.
 {¶ 19} Pursuant to Civ.R. 56(C), summary judgment shall be rendered forthwith if "the pleadings, depositions, answers to interrogatories, written admissions, affidavits, transcripts of evidence, and written stipulations of fact, if any, timely filed in the action, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Accordingly, summary judgment is appropriate only where: (1) no genuine issue of material fact remains to be litigated; (2) the moving party is entitled to judgment as a matter of law; and (3) viewing the evidence most strongly in favor of the non-moving party, reasonable minds can come to but one conclusion, that conclusion being adverse to the non-moving party. Harless v. Willis Day Warehousing Co. (1978),54 Ohio St.2d 64, 66.
 {¶ 20} "[A] party seeking summary judgment, on the ground that the nonmoving party cannot prove its case, bears the initial burden of informing the trial court of the basis for the motion, and identifying those portions of the record that demonstrate the absence of a genuine issue of material fact on the essential element(s) of the nonmoving party's claims." Dresher v. Burt
(1996), 75 Ohio St.3d 280, 293. Once the moving party meets its initial burden, the non-movant must then produce competent evidence of the types listed in Civ.R. 56(C) showing that there is a genuine issue for trial. Id. Because summary judgment is a procedural device to terminate litigation, courts should award it cautiously after resolving all doubts in favor of the non-moving party. Murphy v. Reynoldsburg (1992), 65 Ohio St.3d 356,358-359.
 {¶ 21} We begin our discussion of Mowery's first assignment of error by addressing Mowery's retaliation claim. Mowery argues that Lt. Wiley retaliated against her for requesting permission to meet with the City's EEO office by giving her an undeserved, negative performance appraisal. A claim of retaliation requires a plaintiff to present evidence that: (1) she engaged in protected activity; (2) she was subjected to an adverse employment action; and (3) a causal link exists between the protected activity and the adverse action. Boggs v. The Scotts Co., Franklin App. No. 04AP-425, 2005-Ohio-1264, at ¶ 23, citing Peterson v. BuckeyeSteel Casings (1999), 133 Ohio App.3d 715, 727. The trial court concluded that Mowery failed to submit evidence demonstrating that appellees took an adverse employment action against Mowery because of her participation in protected activity.
 {¶ 22} An adverse employment action need not result in pecuniary loss, such as termination, decrease in salary or loss of benefits, but it must materially affect the terms and conditions of the plaintiff's employment. Hart v. ColumbusDispatch/Dispatch Printing Co., Franklin App. No. 02AP-506, 2002-Ohio-6963, at ¶ 35, citing Peterson at 727. "Factors to consider when determining whether an employment action was materially adverse include `termination of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or other indices that might be unique to a particular situation.'" Peterson at 727, quoting Crady v.Liberty Natl. Bank Trust Co. (C.A.7, 1993), 993 F.2d 132, 136. "Changes in employment conditions that result merely in inconvenience or an alteration of job responsibilities are not disruptive enough to constitute an adverse employment action."Peterson at 727, citing Kocsis v. Multi-Care Mgt., Inc.
(C.A.6, 1996), 97 F.3d 876, 886. "If every low evaluation or other action by an employer that makes an employee unhappy or resentful were considered an adverse action, Title VII would be triggered by supervisor criticism or even facial expressions indicating displeasure." Primes v. Reno (C.A.6, 1999),190 F.3d 765, 767.
 {¶ 23} Having reviewed the evidence submitted in support of and in opposition to summary judgment, we agree with the trial court's determination that Mowery failed to demonstrate that appellees subjected her to an adverse employment action. Lt. Wiley's negative appraisal of Mowery's work performance did not constitute an adverse employment action. See Hann v. PerkinsTwp., Erie App. No. E-03-025, 2004-Ohio-3445, at ¶ 43 (negative statements in personnel file do not, by themselves, represent an adverse employment action); Smart v. Ball State Univ. (C.A.7, 1996), 89 F.3d 437, 442 (a negative evaluation alone, even if undeserved, does not constitute an actionable adverse employment action); Spears v. Missouri Dept. of Corr. Human Resources
(C.A.8, 2000), 210 F.3d 850, 854, citing Enowmbitang v. SeagateTech., Inc. (C.A.8, 1998), 148 F.3d 970, 973-974 ("[a]n unfavorable evaluation is actionable only where the employer subsequently uses the evaluation as a basis to detrimentally alter the terms or conditions of the recipient's employment").
 {¶ 24} Mowery has not demonstrated that her negative performance appraisal affected the terms or conditions of her employment. Although Assistant Chief Rees and Fire Chief Woltz initially recommended termination of Mowery's probationary employment based on her appraisal, Fire Chief Woltz later rescinded his request, and Mowery's employment continued. Mowery submitted no evidence that she received less pay, worse assignments, a less distinguished title or significantly diminished material responsibilities, or that appellees denied her promotions, pay increases or other benefits based on her appraisal. Although Mowery argues that the trial court improperly weighed the evidence to determine that the appraisal was substantiated, whether the appraisal was substantiated is immaterial because appellees took no adverse action against Mowery based on the appraisal.
 {¶ 25} Although Mowery argues that the negative appraisal adversely affected her opportunity to become a permanent, non-probationary employee, the record indicates that Mowery's employment continued well past her probationary period. SeeTademe v. St. Cloud State Univ. (C.A. 8, 2003), 328 F.3d 982,992 (although plaintiff contended that false allegations in his personnel file had a negative impact on his ability to become a full professor, retaliation claim failed where plaintiff did not show that the employer took any adverse action because of the allegations). Upon review, we find that reasonable minds could not conclude that Mowery's negative appraisal constituted an adverse employment action. Therefore, the trial court did not err in granting appellees' motion for summary judgment on Mowery's retaliation claim.
 {¶ 26} We now turn to Mowery's contention that the trial court erred by granting summary judgment on her constructive discharge claim. "The test for determining whether an employee was constructively discharged is whether the employer's actions made working conditions so intolerable that a reasonable person under the circumstances would have felt compelled to resign."Mauzy v. Kelly Services, Inc. (1996), 75 Ohio St.3d 578, paragraph four of the syllabus. As guidance for courts applying the test for constructive discharge, the Supreme Court of Ohio explained:
In applying this test, courts seek to determine whether the cumulative effect of the employer's actions would make a reasonable person believe that termination was imminent. They recognize that there is no sound reason to compel an employee to struggle with the inevitable simply to attain the "discharge" label. * * *
Id. at 589. Thus, courts apply an objective test to determine whether the employer's actions made working conditions so intolerable that a reasonable person under the circumstances would have felt compelled to resign. See id.; Wilson v.Firestone Tire Rubber Co. (C.A.6, 1991), 932 F.2d 510, 515
("[w]hen an employee alleges that he was forced to resign, the employee's perception must be judged objectively without consideration of his undue sensitivities").
 {¶ 27} Mowery first argues that, because the record contained sufficient evidence to warrant denial of summary judgment on her hostile work environment/racial harassment claim, the record necessarily contained evidence to require denial of summary judgment on her constructive discharge claim. We disagree. The United States Supreme Court recently addressed the distinction between a harassment claim and a constructive discharge claim based on a hostile work environment. The Supreme Court stated that "[f]or an atmosphere of * * * harassment or hostility to be actionable, * * * the offending behavior `must be sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment.' "Pennsylvania State Police v. Suders (2004), 542 U.S. 129,146-147, quoting Meritor Savings Bank, FSB v. Vinson (1986),477 U.S. 57, 67. The Supreme Court then went on to state that "[a] hostile-environment constructive discharge claim entails something more: A plaintiff who advances such a compound claim must show working conditions so intolerable that a reasonable person would have felt compelled to resign." (Emphasis added.)Suders at 147.
 {¶ 28} Thus, harassment that is severe and pervasive enough to affect the terms, conditions or privileges of employment does not necessarily render the plaintiff's working conditions so intolerable that a reasonable person would be compelled to resign, as required for a constructive discharge claim. SeeBreeding v. Arthur J. Gallagher Co. (C.A.8, 1999),164 F.3d 1151, 1159 (even if the plaintiff's allegations made out a sexual harassment hostile environment claim, they were insufficient to support a finding of constructive discharge). "[U]nless conditions are beyond `ordinary' discrimination, a complaining employee is expected to remain on the job while seeking redress."Perry v. Harris Chernin, Inc. (C.A.7, 1997), 126 F.3d 1010,1015. The fact that the trial court found sufficient evidence to submit Mowery's hostile work environment claim to the jury does not mandate that the record likewise contained sufficient evidence for submission of Mowery's constructive discharge claim to the jury.
 {¶ 29} The trial court granted summary judgment on Mowery's constructive discharge claim based on its finding that Mowery rejected offers of a transfer by the City, as evidenced by two letters addressed from Assistant City Attorney John H. Summer to Mowery's former attorney, Jill J. Jay Couch. In the first letter, dated September 22, 1999, Mr. Summer wrote:
* * * [T]he Department of Public Safety for the City of Columbus is unconditionally offering Ms. Mowery the opportunity to be reassigned to the Director's Office on special assignment.
Ms. Mowery would be assigned duties comparable to her current ones and continue until such time as another position opens elsewhere in the Department of Public Safety that suits her skills and abilities. This reassignment will at no time result in any loss of pay or benefits. While at the Director's Office, Ms. Mowery would receive free parking which she now has. * * *
In the second letter, dated October 25, 1999, Mr. Summer identified a data entry operator position at the Police Impound Lot "that is available should Ms. Mowery wish to move." In his affidavit, Mr. Summer stated that Mowery rejected both offers. However, in her affidavit and deposition testimony, Mowery denied knowledge of the City's offers. Given the factual dispute over Mowery's awareness of the City's offers of alternate positions, we conclude that her purported rejection of said offers, by itself, did not warrant summary judgment in favor of appellees.
 {¶ 30} Notwithstanding our finding that the City's purported offers of alternate positions, standing alone, did not warrant summary judgment on Mowery's constructive discharge claim, our de novo review of the evidence convinces us that the trial court did not err in granting appellees' motion for summary judgment on that claim. In response to appellees' motion for summary judgment, Mowery failed to present evidence from which a reasonable trier of fact, viewing the evidence in the light most favorable to Mowery, could determine that Mowery was constructively discharged.
 {¶ 31} We agree with the trial court that Mowery's evidence on summary judgment precluded summary judgment on her hostile work environment/racial harassment claim. Mowery's affidavit and deposition testimony include evidence of offensive and inappropriate behavior by Mowery's co-workers, which a reasonable trier of fact could have concluded altered the terms and conditions of Mowery's employment. Nevertheless, as stated above, establishment of a constructive discharge claim requires more. An employee has an obligation not to jump to conclusions and assume that every conflict with an employer evidences a hidden intent by the employer to terminate the employment relationship. Simpsonv. Ohio Reformatory for Women, Franklin App. No. 02AP-588, 2003-Ohio-988, at ¶ 25, citing Jackson v. Champaign Natl. Bank Trust Co. (Sept. 26, 2000), Franklin App. No. 00AP-170.
 {¶ 32} Mowery's deposition testimony indicates that she voluntarily resigned in June 2000, rather than return to work after her extended medical leave. Mowery testified that she "couldn't come back" because "[n]othing had really changed." (Mowery Depo. at 263-264.) Appellees argue that, given the circumstances, Mowery had at least an obligation to return to work after her medical leave to investigate whether her work environment had changed before resigning. This court has previously considered the argument appellees raise here. After reviewing the case law upon which appellees rely, this court stated:
* * * [O]ur review of these cases indicates that these courts reviewed the totality of the circumstances in reaching the conclusion that the employee was not constructively discharged, rather than establishing a rule that an employee must return to work after a leave period to assert constructive discharge. * * *
Starner v. Guardian Industries (2001), 143 Ohio App.3d 461,480. Thus, although Mowery's decision not to return to work after her medical leave does not automatically negate her claim of constructive discharge, we may consider that fact when reviewing the totality of the circumstances surrounding her resignation.
 {¶ 33} Explaining her decision to resign rather than return from her leave, Mowery stated that she was still the only employee who was required to sign a timesheet, take only a half-hour lunch break, and be at work on time. Assuming that Mowery was, indeed, the only employee required to sign a timesheet, limit her lunch break to a half-hour, and report for work on time, such conditions, while arguably unfair, are not so intolerable that a reasonable person would have felt compelled to resign because of them.
 {¶ 34} Much of the evidence on which Mowery relies for her hostile work environment/racial harassment and constructive discharge claims relates to her strained relationship with Lt. Wiley, her direct supervisor during most of her tenure in the Fire Prevention Bureau. In her deposition and affidavit, Mowery described a work environment in which Lt. Wiley closely scrutinized her time and work product. Mowery testified that Lt. Wiley frequently yelled at her, often in the presence of witnesses. Mowery also alleged that Lt. Wiley cited her for insubordination after she refused to complete a false late-for-duty form and gave her an undeserved negative performance review. However, Mowery admitted that she might have been late for work the day she refused to complete the late-for-duty form, and appellees took no adverse action against Mowery based on the negative employment evaluation. Despite her problems with Lt. Wiley, in February 2000, several months before Mowery resigned, Lt. Stevens replaced Lt. Wiley as Mowery's direct supervisor.
 {¶ 35} To assist his replacement, Lt. Wiley authored a special evaluation of Mowery, dated February 17, 2000, in which he wrote that Mowery produced an acceptable quality and quantity of work and had shown acceptable initiative. Lt. Wiley also wrote that Mowery had followed all orders and directives during the previous seven months and that Mowery was "a major asset for the bureau" in terms of customer relations, a category in which she excelled.
 {¶ 36} Although Mowery's affidavit contains a conclusory statement that her work environment did not improve after Lt. Stevens replaced Lt. Wiley, Mowery's deposition testimony belies that contention. Mowery admitted that, even while he remained on site to train Lt. Stevens, Lt. Wiley no longer yelled at her. Mowery admitted that Lt. Stevens did not comment about her race, did not call her names, and did not scream or raise his voice at her. Likewise, Mowery admitted that neither Captain Fullen nor Chief Coles screamed at her, raised his voice to her or commented on her race during the time Mowery was under Lt. Stevens' supervision. Mowery testified that Lt. Stevens was cordial to her, was responsive to her questions, and would require employees to disperse from the front desk where they congregated to talk. Mowery did not file any grievances and did not receive any discipline while under Lt. Stevens' supervision.
 {¶ 37} Mowery also describes instances of racially charged conduct, including the anonymous placement of racial literature in her work mailbox and a continuing pattern of racial comments from her co-workers. We agree with Mowery that such conduct is highly inappropriate in the workplace and do not doubt that Mowery was offended by such conduct. Had nothing changed in the Fire Prevention Bureau between the time Mowery complained about receiving racial literature in her employee mailbox and the time she eventually resigned, we may have reached a different conclusion. However, the distribution of racial literature in Mowery's mailbox ceased many months before Mowery tendered her resignation. In her deposition, Mowery admitted that distribution of racial literature to her mailbox ceased after Chief Coles' meeting in response to her concerns and prior to Lt. Stevens' replacement of Lt. Wiley in Mowery's chain of command. Although Mowery testified that she continued to overhear racial comments from her non-supervisory co-workers after Lt. Stevens replaced Lt. Wiley, Mowery admitted that Lt. Stevens did not take part in any such comments or would take corrective action, by dispersing her co-workers from the front desk, if Mowery complained about overhearing racial comments.
 {¶ 38} For approximately two months before Mowery went on leave, she had a new supervisor who treated her cordially and responded to her complaints of racial comments. No supervisory employees raised their voices to Mowery or commented on her race, the distribution of racial literature to her employee mailbox had stopped, and Mowery had not been disciplined for months. Despite these changes to her work environment, Mowery chose to resign rather than return to work after her medical leave. Considering the totality of these circumstances, we conclude that reasonable minds, viewing the evidence in the light most favorable to Mowery, could not conclude that Mowery's working conditions atthe time of her resignation were so intolerable that a reasonable person would have felt compelled to resign.
 {¶ 39} We additionally conclude that Mowery has presented no evidence that the cumulative effect of appellees' actions would make a reasonable person believe that termination was imminent. Despite her negative appraisal in April 1999, appellees took no action with respect to Mowery's employment, which continued well beyond her probationary period. Mowery did not receive any further negative performance appraisals, and Lt. Wiley stated that he did not discipline Mowery in the seven months prior to Lt. Stevens assuming supervisory control over Mowery. Lt. Stevens did not discipline Mowery while she acted under his supervision. When the City determined that Mowery was absent without leave at the end of May 2000, the City provided her with paperwork to request FMLA leave. From such evidence, a trier of fact could not conclude that a reasonable person would believe that termination was imminent.
 {¶ 40} Accordingly, we conclude that the trial court properly granted appellees' motion for summary judgment on Mowery's constructive discharge claim.
 {¶ 41} We next address Mowery's racial discrimination claim, pursuant to R.C. 4112.02, which provides, in pertinent part:
It shall be an unlawful discriminatory practice:
(A) For any employer, because of the race * * * of any person, to discharge without just cause, to refuse to hire, or otherwise to discriminate against that person with respect to hire, tenure, terms, conditions, or privileges of employment, or any matter directly or indirectly related to employment.
Because R.C. Chapter 4112 is Ohio's counterpart to Title VII of the Civil Rights Act of 1964, Section 2000e et seq., Title 42, U.S. Code ("Title VII"), the Supreme Court of Ohio has acknowledged that federal authority interpreting Title VII is generally applicable to cases alleging violations of R.C. Chapter 4112. Plumbers Steamfitters Commt. v. Ohio Civ. Rights Comm.
(1981), 66 Ohio St.2d 192, 196.
 {¶ 42} There are essentially two theories of employment discrimination: disparate treatment and disparate impact.Albaugh v. Columbus Div. of Police (1999), 132 Ohio App.3d 545,550, citing Hazen Paper Co. v. Biggins (1993), 507 U.S. 604,609. In a disparate treatment claim, the employer treats some people less favorably than others because of their race or other protected characteristics. Hazen Paper Co. at 609, citingIntl. Brotherhood of Teamsters v. United States (1977),431 U.S. 324, 335-336, fn. 15. In Count 1 of her complaint, Mowery raised a claim of disparate treatment based on race, alleging that appellees treated her differently and created terms and conditions of employment different from similarly situated African-American employees. We presently address the trial court's entry of summary judgment on that claim.
 {¶ 43} The starting point for judicial inquiry into complaints alleging disparate treatment on the basis of race isMcDonnell Douglas Corp. v. Green (1973), 411 U.S. 792, in which the United States Supreme Court established a flexible formula to ferret out impermissible discrimination in the hiring, firing, promoting, and demoting of employees. Plumbers Steamfitters at 197. The plaintiff has the burden of proving a prima facie case of discrimination. Albaugh at 550, citingTexas Dept. of Community Affairs v. Burdine (1981),450 U.S. 248, 252-253. To establish a prima facie case of discrimination in a disparate treatment case, a plaintiff must generally demonstrate that: (1) she is a member of a protected class; (2) she suffered an adverse employment action; (3) she was qualified for the position; and (4) either she was replaced by someone outside the protected class or a comparable, non-protected person was treated more favorably. Samadder v. DMF of Ohio, Inc.,154 Ohio App.3d 770, 2003-Ohio-5340, at ¶ 35, citing McDonnellDouglas; James v. Delphi Automotive Sys., Franklin App. No. 04AP-215, 2004-Ohio-5493, at ¶ 7.
 {¶ 44} In cases of reverse discrimination, where the plaintiff bears the burden of demonstrating that her employer intentionally discriminated against her despite her majority status, courts have somewhat altered the elements of the prima facie case. See Murray v. Thistledown Racing Club, Inc. (C.A.6, 1985), 770 F.2d 63, 67. Specifically, some courts have altered the first element of the prima facie case by requiring a Caucasian plaintiff to demonstrate "background circumstances supporting the inference that [the plaintiff's employer] was the unusual employer who discriminated against [the majority]."Grooms v. Supporting Council of Preventative Effort,157 Ohio App.3d 55, 2004-Ohio-2034, at ¶ 20, quoting Ekstrom v. CuyahogaCty. Community College, 150 Ohio App.3d 169, 2002-Ohio-6228, at ¶ 43, 45. Thus, to establish a prima facie case of reverse race discrimination, a plaintiff must show: (1) background circumstances supporting the inference that the plaintiff's employer was the unusual employer who discriminated against non-minority employees; (2) that the employer took an action adverse to the plaintiff's employment; (3) that the plaintiff was qualified for the position; and (4) that the employer treated the plaintiff disparately from similarly situated minority employees.Courie v. ALCOA, 162 Ohio App.3d 133, 2005-Ohio-3483, at ¶ 20, citing Grooms at ¶ 20.
 {¶ 45} In her complaint, Mowery alleged that appellees treated her differently than her African-American co-workers, who received longer lunch periods, preferential treatment regarding parking spaces, and less monitoring of their work. Mowery also claimed that her co-workers were not required to follow sign-in procedures that Lt. Wiley required her to follow. The trial court concluded that Mowery failed to establish a prima facie case of disparate treatment because she failed to identify any similarly situated African-American employee and failed to demonstrate that appellees treated her differently from her African-American co-workers.
 {¶ 46} The trial court determined that Mowery was not similarly situated to her African-American co-workers, Williams and Waddell, because, unlike her co-workers, Mowery was a probationary employee. Federal courts have frequently noted that probationary employees are not similarly situated to their non-probationary co-workers:
Case law * * * challenges a finding that probationary and permanent employees are similarly-situated. See Herr v. AirborneFreight Corp., 130 F.3d 359, 362 (8th Cir. 1997) (probationary female employee unprotected by collective bargaining agreement not similarly situated to male employees); McKenna v.Weinberger, 729 F.2d 783, 789 (D.C. Cir. 1984) (female probationary employee not similarly situated to male permanent employees); Williams v. Cuomo, 961 F. Supp. 1241, 1245
(N.D.Ill. 1997), aff'd., 151 F.3d 1035 (7th Cir. 1998), cert.denied, 525 U.S. 1160, 119 S.Ct. 1070, 143 L.Ed.2d 74 (1999) (no similarly-situated employees to black male who was the only probationary employee).
White v. State of Ohio (C.A.6, 2001), 2 Fed.Appx. 453, 457; see, also, Steinhauer v. DeGolier (C.A.7, 2004),359 F.3d 481, 484-485; Burgess v. State of Washington (C.A.9, 1999), 199 F.3d 1331, unpublished opinion, 1999 WL 974182. In accordance with such authority, we agree with the trial court that, during her probationary period, Mowery was not similarly situated to her non-probationary co-workers. Nevertheless, the record on summary judgment did not establish that the alleged disparate treatment persisted only during Mowery's probationary period, which terminated in August 1999. There is no evidence that the alleged disparities in lunch hours, parking, enforcement of the sign-in policy, and supervisory monitoring ended with the termination of Mowery's probationary status. In fact, Mowery testified that appellees' enforcement of the sign-in policy exclusively against her continued after Lt. Stevens assumed Lt. Wiley's position, approximately six months after Mowery's probationary period ended. Thus, Mowery's probationary status does not preclude her demonstrating disparate treatment of similarly situated employees during the entirety of her employment.
 {¶ 47} Although the trial court concluded that Mowery failed to demonstrate that appellees treated her differently from similarly situated African-American co-workers, we conclude that Mowery's prima facie case of disparate treatment fails because, as explained above, Mowery did not demonstrate that she suffered any adverse action. As stated above, the negative appraisal of Mowery's performance does not constitute an adverse action. Moreover, Mowery was never disciplined for parking behind the building, despite continuing to do so after Lt. Wiley instructed her to park in front of the building, taking long lunches or failing to follow the sign-in procedures. Mowery did receive a memo of counseling for failing to follow her chain of command when asking a firefighter assigned to light duty to assist in filing. Mowery alleges that Williams was not counseled for subsequently engaging in the same conduct. Even if Lt. Wiley did counsel Williams for asking assistance from a light duty firefighter without following her chain of command, we do not find that a memo of counseling constitutes an adverse employment action that materially affected the terms and conditions of Mowery's employment. Because Mowery failed to present evidence that appellees took any action adverse to her employment, the trial court did not err by granting appellees' summary judgment on Mowery's disparate treatment claim.
 {¶ 48} We now turn to the trial court's grant of summary judgment on Mowery's claim for intentional infliction of emotional distress. To establish a claim for intentional infliction of emotional distress, a plaintiff must show that the defendant, through extreme and outrageous conduct, intentionally or recklessly caused the plaintiff severe emotional distress.Yeager v. Local Union 20 (1983), 6 Ohio St.3d 369, 374, citing Restatement of the Law 2d, Torts (1965) 71, Section 46(1). A plaintiff must demonstrate that: (1) the defendant intended to cause emotional distress or knew or should have known that its actions would result in serious emotional distress to the plaintiff; (2) the defendant's conduct was so extreme and outrageous as to go beyond all possible bounds of decency and was such that it can be considered utterly intolerable in a civilized community; (3) the defendant's actions were the proximate cause of the plaintiff's psychic injury; and (4) the mental anguish the plaintiff suffered is serious and of a nature that no reasonable person could be expected to endure. Burkes v. Stidham (1995),107 Ohio App.3d 363, 375.
 {¶ 49} With respect to the requirement that conduct be extreme and outrageous, the Supreme Court of Ohio looked to Restatement of the Law 2d, Torts (1965) 71, Section 46(1), comment d:
" * * * It has not been enough that the defendant has acted with an intent which is tortious or even criminal, or that he has intended to inflict emotional distress, or even that his conduct has been characterized by" malice," or a degree of aggravation which would entitle the plaintiff to punitive damages for another tort. Liability has been found only where the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community. Generally, the case is one in which the recitation of the facts to an average member of the community would arouse his resentment against the actor, and lead him to exclaim, `Outrageous!'
"Yeager at 374-375. Liability for intentional infliction of emotional distress "does not extend to mere insults, indignities, threats, annoyances, petty oppressions, or other trivialities." Id. at 375.
 {¶ 50} Here, the trial court found that Mowery failed to produce evidence of conduct that was so extreme and outrageous as to go beyond all possible bounds of human decency. Mowery argues that the evidence upon which the trial court based its denial of her hostile work environment claim satisfies the extreme and outrageous requirement for an intentional infliction of emotional distress claim. We disagree. Although we do not doubt that her co-workers' racial comments, jokes, criticism, and distribution of racially volatile literature were offensive to Mowery and inappropriate for the workplace, we agree with the trial court that Mowery's evidence fails to demonstrate conduct that was so extreme and outrageous to go beyond all bounds of human decency, as required by Ohio law.
 {¶ 51} Contrary to Mowery's argument, evidence sufficient to submit a hostile work environment claim to a jury does not necessarily also suffice to require submission of an intentional infliction of emotional distress claim to a jury. Not every discriminatory act by an employer will be severe enough to impose liability for intentional infliction of emotional distress. SeeRoush v. KFC Natl. Mgt. Co. (C.A.6, 1993), 10 F.3d 392,396-397, 400-401 (evidence upon which jury awarded age discrimination verdict for plaintiff did not rise to the level of extreme and outrageous conduct). Numerous federal courts have refused to recognize an intentional infliction of emotional distress claim, even where the evidence upon which that claim was based was sufficient to send a Title VII hostile work environment claim to a jury. See Collier v. RAM Partners, Inc. (D.Md. 2001), 159 F.Supp.2d 889, 901-902 ("although certainly abhorrent, [co-worker's] conduct and RAM's alleged unresponsiveness to it do not rise to the high level of outrageousness * * * required for * * * intentional infliction of emotional distress"); Antonopoulosv. Zitnay (D.Conn. 2005), 360 F.Supp.2d 420, 429 ("[w]hile [plaintiff] has made a prima facie case that defendants' conduct may be actionable under Title VII, her allegations are insufficient to create a genuine issue of material fact as to whether the named defendants * * * committed extreme and outrageous conduct"); Reynolds-Diot v. Group I Software, Inc.
(N.D.Tex. 2005), No. 3:03-CV-0245-M, unpublished opinion, 2005 WL 1980989 (evidence showing a pattern of sexually explicit comments and humiliating sexual propositions was sufficient to create a question of fact as to a hostile work environment claim but did not rise to the level of extreme and outrageous conduct required for intentional infliction of emotional distress). Accordingly, we conclude that the trial court did not err in granting summary judgment on Mowery's claim for intentional infliction of emotional distress.
 {¶ 52} For the reasons stated above, we overrule Mowery's first assignment of error.
 {¶ 53} We now turn to Mowery's second assignment of error, in which she argues that the trial court committed reversible error by excluding from evidence at trial the City's EEO Report. We review the trial court's ruling on discovery issues for abuse of discretion. "`The term "abuse of discretion" connotes more than an error of law or judgment; it implies that the court's attitude is unreasonable, arbitrary or unconscionable.'" Blakemore v.Blakemore (1983), 5 Ohio St.3d 217, 219, quoting State v.Adams (1980), 62 Ohio St.2d 151, 157. Further, "`[e]rror in the admission of evidence is not grounds for reversal unless substantial rights of the complaining party were affected or it appears that substantial justice was not done.'" Winkler v.Winkler, Franklin App. No. 02AP-937, 2003-Ohio-2418, at ¶ 88, quoting Kish v. Withers (1997), 123 Ohio App.3d 132, 136. In determining whether error regarding exclusion or admission of evidence affected a substantial right of a party, an appellate court must decide whether the trier of fact would have probably reached the same conclusion had the error not occurred. Id.
 {¶ 54} Brenda J. Price and Melvin V. Richardson, J.D., signed the EEO Report. The EEO Report identifies Price as "Equal Opportunity Officer/Chief investigator and fact-finder," and identifies Richardson as "Equal Employment Opportunity Manager[,] Office of Equal Employment Opportunity." The EEO Report contains: background information on Mowery; the allegations in Mowery's EEO Complaint; Lt. Wiley and Captain Fullen's responses to Mowery's allegations; a finding of founded or unfounded as to each allegation; a statement of the information considered in formulating the EEO Report; a discussion of Mowery's disparate treatment, racial harassment, and retaliation claims; and summary findings. In their summary findings, Price and Richardson concluded that there was probable cause to believe that: Mowery was subjected to disparate treatment based on her race with regard to lunch hour requirements and parking; Mowery was subjected to racial harassment with regard to racial statements and literature; and Mowery's negative performance appraisal constituted retaliation. Mowery did not call either Price or Richardson as witnesses at trial.
 {¶ 55} Appellees objected to the admissibility of the EEO Report and any testimony regarding the conclusions contained therein during Mowery's direct examination. Appellees initially argued that the EEO Report is inadmissible hearsay. Appellees also argued that the EEO Report is confusing, unduly prejudicial, and irrelevant, because it is the jury's responsibility to determine whether Mowery was the victim of racial harassment. In response, Mowery argued that the EEO Report is admissible as an admission of a party-opponent, pursuant to Evid.R. 801(D)(2)(d), and is probative as to the City's knowledge of the alleged harassment and the City's response thereto. After hearing arguments by counsel and reviewing relevant case law, the trial court excluded the EEO Report and testimony regarding the conclusions set forth therein.
 {¶ 56} The trial court engaged in a lengthy discussion on the admissibility of the EEO Report. After hearing the parties' initial arguments, the trial court stated:
* * * I'm going to allow [Mowery] to testify concerning what she — you know, that this matter was referred to the city. The city investigated it, and then she can go on and testify that, based upon whatever the city said, what she did, and what happened after that, but not anything about the report itself. * * *
(Tr. at 95-96.) The trial court reasoned:
* * * I have a problem with presenting to the jury some conclusion made by someone else that's the ultimate issue in the case, * * * because that's what they are here for, to hear all of the facts and then to — based upon the law — come to a conclusion as to what transpired here, and to have themselves a report that gets to that ultimate conclusion as to what some third party has concluded, when that third party is not going to be here to tell them all of these things that they have taken into consideration, whether they were appropriate or not, and besides that, they also took into consideration probably some of the areas that have been excluded from this lawsuit by the motion for summary judgment.
Therefore, to have them use that as a basis for them making a decision, I have a problem with that.
(Tr. at 100.)
 {¶ 57} The following morning, the trial court reiterated its ruling but noted:
That does not preclude [Mowery] from giving the jury the facts and the information from direct witnesses with respect to what was going on, or even the components of the report with respect to this occurred, that occurred, et cetera, but I think the jury should listen to that evidence and make their decision as to whether or not there were violations of plaintiff's rights and not have them take what the City of Columbus has said and use that as a method of determining the outcome in this case.
(Tr. at 106-107.) The trial court did not expressly state whether the EEO Report qualified as an admission of a party-opponent, and, when Mowery's counsel asked the trial court whether it was excluding the EEO Report as hearsay, the court stated:
* * * [T]here is hearsay in there, without a doubt, but what it amounts to is someone — we're going to have a report that was compiled by the city — by someone working for the city that basically goes to the ultimate question itself, and the ultimate issue pending before the jury here, and we're going to have this report come in saying that the city's EEO office said there was a problem here with the environment, and that's what this jury is to determine, as to whether or not there was a problem with the environment.
(Tr. at 108.)
 {¶ 58} We first address Mowery's contention that the EEO Report is not hearsay because it is an admission of a party-opponent. A statement is not hearsay if "[t]he statement is offered against a party and is * * * a statement by his agent or servant concerning a matter within the scope of his agency or employment, made during the existence of the relationship[.]" Evid.R. 801(D)(2)(d). "[T]he pivotal inquiry for admission of a statement under Evid.R. 801(D)(2)(d) is whether the statement was made by an agent or employee of the party-opponent, during the existence of the relationship, concerning a matter within the scope of the employment or agency." Davis v. Sun Refining Marketing Co. (1996), 109 Ohio App.3d 42, 53. Mowery clearly offered the EEO Report against the City, and there is no dispute that both Price and Richardson were, at all relevant times, City employees. Thus, the only remaining question with respect to whether the EEO Report qualifies as an admission of a party-opponent is whether it concerns a matter within the scope of Price's and Richardson's employment.
 {¶ 59} For a statement to qualify as an admission of a party-opponent, the agency relationship need not encompass authority to make damaging statements but requires only the authority to take action concerning the subject matter of the statements. Ball v. Consol. Rail Corp. (2001),142 Ohio App.3d 748, 756, citing Pappas v. Middle Earth Condominium Assn.
(C.A.2, 1992), 963 F.2d 534, 538. "In keeping with the liberal policy of admitting statements under Evid.R. 801(D)(2), the fact and scope of the agency can be proven through circumstantial evidence." Id. Moreover, in determining the scope of an agent's authority, a court may consider the content of the alleged admission itself. See Ball at 756 ("[t]he content of the documents at issue supports the conclusion that PSI was hired to do asbestos inspections by Conrail and authorized to report on their results").
 {¶ 60} We find sufficient evidence in the record to conclude that the statements contained in the EEO Report fall within the scope of Price's and Richardson's employment. When she filed her EEO Complaint, Mowery met with Price and Richardson. Mowery described Richardson as the "head of the EEO office." (Tr. at 74.) Price's signature appears on Mowery's EEO Complaint as the "EEO Representative accepting this complaint[.]" Mowery testified that, during the course of the EEO investigation, she again met with Price and Richardson. Both Price and Richardson signed the EEO Report as representatives of the City EEO office. From such evidence, it may be deduced that Price and Richardson had authority to take action concerning Mowery's allegations of discrimination and harassment, and that the EEO Report concerned a matter within the scope of their employment. Because City employees authored the EEO Report during the existence of their employment relationship and within the scope of their employment, the EEO Report constitutes an admission of a party-opponent pursuant to Evid.R. 801(D)(2)(d).[3]
 {¶ 61} Other courts have similarly held or suggested that EEO investigative findings qualify as admissions of a party-opponent when offered against the employer. See Sanders v. New York CityHuman Resources Adm. (C.A.2, 2004), 361 F.3d 749 (written statements by employees of agency's in-house EEO office, who investigated the plaintiff's complaints, qualified as 801(D)(2) admissions but not as direct evidence of retaliation); Tuohey v.Chicago Park Dist. (N.D.Ill. 1997), No. 95 C 1429, unpublished opinion, 1997 WL 12791, affirmed (C.A.7, 1998), 148 F.3d 735 (EEO director's report that summarized out-of-court statements by several witnesses qualified as admission under Fed.R.Evid.801[d][2]); Polkow v. CSX Trans., Inc. (N.D.Ohio, 2003), No. 1:02 CV 72, unpublished opinion, 2003 WL 23784462 (statement by EEO manager to EEOC qualifies as admission of party-opponent despite lack of first-hand knowledge of the events described).
 {¶ 62} Our finding that the EEO Report constitutes an admission of a party-opponent does not equal a finding that the EEO Report was admissible at trial. Admissions of party-opponents, although not hearsay, are still subject to general rules of admissibility, including Evid.R. 401 and 403. See Boom v. Robinson (July 5, 2001), Summit App. No. 20314;State v. Milligan (Mar. 24, 1988), Cuyahoga App. No. 53630.
 {¶ 63} On several occasions, the Sixth Circuit has had the opportunity to address the admissibility of EEOC probable cause determinations. In Heard v. Mueller Co. (C.A.6, 1972),464 F.2d 190, 194, the Sixth Circuit ruled that it is "within the [sound] discretion [of the district court] whether or not to accept the EEOC's final investigation report" in evidence. More recently, a panel of the Sixth Circuit went further, holding that a district court does not err as a matter of law by categorically refusing to admit EEOC cause determinations. EEOC v. Ford Motor Co.
(C.A.6, 1996), 98 F.3d 1341, unpublished opinion, 1996 WL 557800.
 {¶ 64} In exercising discretion to determine whether to admit a probable cause finding, courts use the balancing test set forth in Evid.R. 403, which provides for exclusion of relevant evidence if the danger of unfair prejudice, confusion of the issues or misleading the jury substantially outweighs the probative value of the evidence. See Williams v. Nashville Network (C.A.6, 1997), 132 F.3d 1123 (affirming exclusion of an EEOC report under Evid.R. 403, in part because a jury may attach undue weight to the probable cause determination, viewing it instead as a finding of discrimination); Ricker v. Food Lion, Inc. (C.A.6, 2001), 3 Fed.Appx. 227 (affirming exclusion of an EEOC cause determination, finding it of little, if any, probative value where the district court could consider the same evidence presented to the EEOC).
 {¶ 65} While we acknowledge that, unlike an EEOC probable cause finding, the EEO Report at issue here was issued, not by a third-party agency but, rather, by the City's own EEO office, we do not find that distinction dispositive. While we find the EEO Report probative, we find that the potential for unfair prejudice to appellees and confusion of the issues before the jury substantially outweighs its probative value. The EEO Report contains lengthy discussions of and conclusions regarding Mowery's claims of disparate treatment and retaliation, which were not before the jury. Additionally, the EEO Report presents a substantial danger of jury confusion based on the interplay of the EEO Report's conclusion of probable cause and the jury's responsibility to independently evaluate the evidence under the trial court's instructions of law to determine whether the evidence demonstrates a violation of R.C. 4112. Although the EEO Report is a probable cause determination rather than a finding of a violation, Price and Richardson state in the report that two pieces of literature distributed in the Fire Prevention Bureau meet the racial harassment standard under Title VII and that evidence proved "beyond a preponderance" that Mowery was subjected to an "intimidating, hostile, and offensive [work environment] due to the literature distribution and verbal comments, jokes, remarks, etc., that were made by black employees." Such statements give the impression that the EEO Report was more than a finding of probable cause and more akin to an actual finding of a statutory violation. Given such statements, juror confusion is probable. The fact that the City's own EEO office, as opposed to the EEOC, drafted the report at issue here does not lessen the substantial likelihood of juror confusion and undue prejudice.
 {¶ 66} Here, the EEO Report presented great potential for jury confusion concerning the interplay of the City's sexual harassment policy and Ohio statutory liability under R.C. Chapter 4112. The EEO Report repeatedly references EEOC guidelines, the EEOC compliance manual, and Title VII. It is unclear from the EEO Report itself that Price and Richardson based their conclusions solely on internal policy rather than on state or federal statutory law. Where, as here, the statement at issue is contained in a written report and the authors of the report do not testify and, therefore, are not subject to cross-examination regarding the basis of their conclusions, a jury might improperly and prematurely presume guilt. Although a curative instruction may have alleviated some of the confusion that admission of the EEO Report would likely have engendered in this case, we do not find that the trial court's exclusion of the EEO Report, after thoughtful consideration of the parties' arguments regarding its admissibility, constituted an abuse of discretion.
 {¶ 67} But even if the trial court had abused its discretion by refusing to admit the EEO Report, reversal would be unwarranted. Error in the admission or exclusion of evidence is grounds for reversal only where substantial rights of the complaining party were affected or it appears that substantial justice was not done. Winkler at ¶ 88, quoting Kish at 136. To determine whether a substantial right of the party has been affected, a reviewing court must decide whether the trier of fact would have probably reached the same conclusion had the error not occurred. Id. Upon review, we do not find that the trial court's exclusion of the EEO Report affected Mowery's substantial rights nor do we find that the trial court's ruling prevented substantial justice below.
 {¶ 68} We reject Mowery's argument that, because the record included evidence of the EEO investigation but no evidence of the result of that investigation, the jury could logically infer that that result was adverse to her. Although not evidence, Mowery's counsel stated in his opening argument to the jury that the City EEO office issued a report, which stated that there was probable cause to believe that Mowery was harassed because she was white. Mowery also testified that the EEO office's investigation resulted in a finding in her favor. When identifying her EEO Complaint at trial, Mowery testified that the complaint "was the beginning of the procedures for my case that I won[.]" (Emphasis added. Tr. at 75.) Appellees did not object to Mowery's statement that she "won" her EEO case. Later, when asked whether the EEO issued a report after its investigation, Mowery testified that "[t]hey issued a report and found four things for me[.]" (Tr. at 90.) Although appellees objected, and the court's thorough consideration of the EEO Report's admissibility ensued, the court did not instruct the jury to disregard Mowery's statement. Only when Mowery testified for a third time that the EEO office issued a report in her favor did the trial court instruct the jury to disregard Mowery's statement. We do not find that the trial court's exclusion of further testimony or of the EEO Report itself would permit the jury to infer that the EEO Report was adverse to Mowery.
 {¶ 69} Additionally, the bulk of information in the EEO Report that related to Mowery's harassment claim was otherwise included as part of the trial record. For example, the EEO Report repeats, verbatim, the allegations in Mowery's EEO Complaint, which the trial court admitted into evidence and about which Mowery testified extensively. In support of their finding of probable cause on Mowery's harassment claim, Price and Richardson relied on the racial literature and racial comments of Mowery's co-workers. Mowery, as well as other witnesses, testified to the distribution and content of the racial literature in the Fire Prevention Bureau. The trial court also admitted the racial literature as trial exhibits. Additionally, Mowery and McCoy testified as to the racial comments alleged in Mowery's EEO Complaint. Thus, the substance of the EEO Report, with respect to Mowery's harassment claim, was before the jury, even though the EEO Report itself was not.
 {¶ 70} Although the trial court excluded any testimony on the EEO Report's conclusions, beyond Mowery's initial statements that the EEO Report favored her, Mowery's counsel repeatedly conceded the appropriateness of a limiting instruction, reminding the jury of their responsibility to make their own determination of whether Mowery was the victim of racial harassment in violation of R.C. Chapter 4112. In doing so, Mowery's counsel conceded that, even had the trial court admitted the EEO Report, the conclusions contained therein would not have been binding on the jury with respect to whether Mowery was the victim of racial harassment.
 {¶ 71} Although Mowery argues that the conclusions of the EEO Report were necessary to establish that the City failed to take appropriate steps to prevent the continuation of harassment, the jury concluded that Mowery was not subjected to a racially hostile work environment. Jury interrogatories reveal that the jury did not find that Mowery's co-workers or Lt. Wiley created a racially hostile work environment. Jury interrogatories further reveal that the jury did not find that Mowery was subjected to racial harassment that was sufficiently severe and pervasive to alter the terms and conditions of her employment and create a work environment that either Mowery subjectively found or that a reasonable person would have objectively found abusive. Given the jury's findings that Mowery was not subjected to a hostile work environment, any consideration of the City's response to the EEO Report is moot.
 {¶ 72} Upon review, we conclude that the trial court did not err in excluding the EEO Report to avoid jury confusion and undue prejudice to appellees. We further conclude that, even if exclusion of the EEO Report was in error, such exclusion did not affect Mowery's substantial rights or result in a denial of substantial justice. Accordingly, we overrule Mowery's second assignment of error.
 {¶ 73} In her third assignment of error, Mowery claims that the jury's verdict on her hostile work environment harassment claim was against the manifest weight of the evidence. Under R.C.4112.02, a plaintiff may bring a claim where she can show that severe and pervasive harassment based on race altered the conditions of her employment by creating a "hostile work environment." Rice v. Cuyahoga Cty. Dept. of Justice Affairs,
Cuyahoga App. No. 85576, 2005-Ohio-5337, at ¶ 31, citing Tarverv. Calex Corp. (1998), 125 Ohio App.3d 468. "[A] hostile work environment occurs when a work atmosphere is so hostile to a protected class of individuals that it alters the conditions of the employment for individuals of that class." Sheffield Villagev. Ohio Civ. Rights Comm. (June 7, 2000), Lorain App. No. 99CA007283, citing Harris v. Forklift Sys., Inc. (1993),510 U.S. 17, 21. Mowery asserts a hostile work environment claim in Count 3 of her complaint, labeling that claim "racial harassment."
 {¶ 74} Mowery argues that she presented evidence of daily racial slurs and epithets in the Fire Prevention Bureau, that she presented undisputed evidence of the distribution of racial literature, and that such conduct did not cease after she and McCoy complained to Captain Fullen and Chief Coles. Mowery also argues that appellees did not present testimony from the employees that Mowery identified as making racially biased comments in the workplace. Based on such evidence, Mowery contends that the jury lost its way in rendering a verdict in favor of appellees. We disagree.
 {¶ 75} A judgment supported by some competent, credible evidence going to all the essential elements of the claim upon which it is rendered will not be reversed as being against the manifest weight of the evidence. C.E. Morris Co. v. FoleyConstruction Co. (1978), 54 Ohio St.2d 279, 280. When reviewing a judgment on a manifest weight of the evidence challenge, an appellate court is guided by a presumption that the findings of the trier-of-fact were correct. Seasons Coal Co. v. Cleveland
(1984), 10 Ohio St.3d 77, 79-80. A judgment is not against the manifest weight of the evidence merely because inconsistent evidence was presented at trial. Young v. Univ. of Akron,
Franklin App. No. 04AP-318, 2004-Ohio-6720, at ¶ 25. Rather, if the evidence is susceptible of more than one construction, an appellate court must give it the construction that is consistent with the verdict and judgment. Karches v. City of Cincinnati
(1988), 38 Ohio St.3d 12, 19.
 {¶ 76} When confronted with a manifest weight of the evidence argument, the appellate court reviews the entire record, weighs the evidence and all reasonable inferences, considers the credibility of witnesses, and determines whether, in resolving evidentiary conflicts, the finder of fact clearly lost its way and created such a manifest miscarriage of justice that the judgment must be reversed. State v. Thompkins (1997),78 Ohio St.3d 380, 387, citing State v. Martin (1983),20 Ohio App.3d 172, 175. Nevertheless, the appellate court must bear in mind the trier of fact's superior, first-hand perspective in judging the demeanor and credibility of witnesses. Caldwell v. Ohio StateUniv., Franklin App. No. 01AP-997, 2002-Ohio-2393, at ¶ 56. The power to reverse on manifest weight grounds should be used only in extraordinary circumstances, when "the evidence weighs heavily against the [judgment]." Id., quoting Thompkins at 387.
 {¶ 77} A hostile work environment exists when the workplace is permeated with "`discriminatory intimidation, ridicule, and insult,'" that is "`sufficiently severe or pervasive to alter the conditions of the [plaintiff's] employment and create an abusive working environment[.]'" Harris at 21, quoting Meritor SavingsBank at 65, 67. In the instant case, the jury interrogatories indicate that the jurors did not find by a preponderance of the evidence that Mowery was subjected to racial harassment that was sufficiently severe or pervasive to alter the conditions of her employment and create a work environment that a reasonable person would find abusive. The jurors did not find by a preponderance of the evidence that either Mowery's co-workers or Lt. Wiley created a racially hostile work environment. However, the jurors did find, by a preponderance of the evidence, that Mowery unreasonably failed to take advantage of preventative or corrective opportunities provided by the City or to otherwise avoid harm.
 {¶ 78} In support of their position that competent, credible evidence supports the jury's verdict, appellees point to Mowery's own testimony on cross-examination. Appellees' counsel questioned Mowery extensively about notes of her co-workers' activities that Mowery began taking sometime around April 1999, and took on almost a daily basis. Mowery testified that she took notes of things that were important to her.
 {¶ 79} On cross-examination, appellees attempted to impeach Mowery's credibility by demonstrating the absence in Mowery's detailed notes and EEO Complaint of many of the alleged incidents about which she testified at trial. Mowery testified that her co-workers made daily comments about hating white people and that Lt. Wiley also stated that he hated white people. Mowery also testified that Lt. Wiley and her African-American co-workers made daily comments to the effect that they wanted an all-black department. However, Mowery's detailed notes contain no record of any such comments by either her co-workers or Lt. Wiley. In her EEO Complaint, Mowery did not attribute any racial comments directly to Lt. Wiley. On cross-examination, Mowery admitted that she previously testified under oath, in her deposition, that she had not heard Lt. Wiley ever make a racially derogatory comment about hating white people.
 {¶ 80} Mowery also testified that the distribution of racially offensive literature in the Fire Prevention Bureau continued after the March 18, 1999 meeting at which Chief Coles informed those in attendance that he would not tolerate distribution of such literature and that he would recommend disciplinary action against any person responsible for such conduct. At trial, Mowery testified that distribution of racial literature continued even after the EEO office issued the EEO Report in November 1999. Nevertheless, Mowery was unable to identify any record in her notes that she subsequently complained to Chief Coles about continuing to receive racial literature, in direct contravention of his orders to cease distribution of such literature.
 {¶ 81} In addition to their cross-examination of Mowery, appellees presented testimony from Chief Coles, Captain Fullen, and Lt. Wiley to defeat Mowery's hostile work environment claim. Chief Coles denied receiving any further complaints of racial conduct after his March 18, 1999 permits section staff meeting, in which Mowery and McCoy initially brought the racial comments and distribution of racial literature to his attention. At that meeting, Chief Coles stated that he would not tolerate distribution of such literature. Chief Coles held a subsequent meeting for the entire Fire Prevention Bureau on April 28, 1999, to "address these issues and to make sure, to the extent possible, that everybody understood what the policies were and what was acceptable and what was not." (Tr. at 406.)
 {¶ 82} On April 29, 1999, McCoy wrote a memorandum to inform Captain Fullen that, immediately following the previous day's meeting, bureau employees congregated to laugh and joke about the meeting and made disparaging comments about Mowery and McCoy for complaining about the racial conduct. In response to McCoy's concerns, Captain Fullen instructed Lt. Wiley to monitor the permits section employees more closely. Captain Fullen also began walking around the permits section approximately twice a day to monitor the environment. Captain Fullen counseled the employees named in McCoy's memorandum and arranged mandatory cultural sensitivity training for all employees. Captain Fullen testified that McCoy did not voice any further concerns or frustrations to him. Other than McCoy's written comments about behavior that occurred immediately after the April 28, 1999 meeting, Captain Fullen testified that he was unaware of any subsequent racial comments in the workplace. Chief Coles was unaware of the concerns raised in McCoy's April 29, 1999 memorandum.
 {¶ 83} On the evidence presented at trial, the jury reasonably could have drawn certain conclusions that would defeat Mowery's hostile work environment claim. The jury could have concluded that the City addressed any harassing conduct when informed, followed up, and had no reason to believe that the harassment was continuing. The jury could also have concluded that any harassment that Mowery suffered was not severe or pervasive enough to warrant relief. This court must bear in mind the jury's superior, first-hand perspective in judging witnesses' demeanor and credibility. Caldwell at ¶ 56. A jury is free to believe all, part or none of the testimony of any witness who testifies before it. Luft v. Perry Cty. Lumber Supply Co.,
Franklin App. No. 02AP-559, 2003-Ohio-2305, at ¶ 24, citingRogers v. Hill (1998), 124 Ohio App.3d 468, 470. Even if appellees' conduct constituted racial harassment, "it was within the jury's province to find that this harassment did not unreasonably interfere with appellant's work performance or create a sufficiently hostile and abusive work environment to be actionable under * * * R.C. 4112.02[.]" See Malloy v. City ofCleveland (Mar. 4, 1999), Cuyahoga App. No. 73789. On the record before us, we cannot say that the jury clearly lost its way and reached an unsupported conclusion by rendering its verdict in favor of appellees. Accordingly, we overrule Mowery's third assignment of error.
 {¶ 84} For the foregoing reasons, we overrule Mowery's three assignments of error and affirm the judgment of the Franklin County Court of Common Pleas.
Judgment affirmed.
Bryant and Travis, JJ., concur.
[1] McCoy's married name is Garbline, but for consistency, we refer to her throughout as "McCoy."
[2] Mowery attached the EEO Report to her memorandum contra appellees' motion for summary judgment, but the trial court excluded the EEO Report from evidence at trial. Admissibility of the EEO Report is the subject of Mowery's second assignment of error.
[3] To the extent that Price and Richardson repeat statements of other City employees within the EEO Report, such statements are likewise non-hearsay under Evid.R. 801(D)(2)(d). Hearsay within hearsay is not excluded if each layer is admissible in and of itself. Evid.R. 805.