[Cite as *Bromall v. Select Specialty Hosp. Akron, L.L.C.*, 2022-Ohio-2496.]

# COURT OF APPEALS OF OHIO

## EIGHTH APPELLATE DISTRICT
## COUNTY OF CUYAHOGA

BONNIE G. BROMALL, EXECUTOR,           :

    Plaintiff-Appellant,           :

                                                        No. 110914

    v.           :

SELECT SPECIALITY,
HOSPITAL – AKRON, L.L.C., ET AL.,           :

    Defendants-Appellees.           :

---

## JOURNAL ENTRY AND OPINION

**JUDGMENT:** AFFIRMED
**RELEASED AND JOURNALIZED:** July 21, 2022

---

Civil Appeal from the Cuyahoga County Court of Common Pleas
Case No. CV-18-895236

---

### *Appearances:*

Casey Law Co., LPA, and James S. Casey; Kisling, Nestico & Redick, LLC, Christopher J. Van Blargan, and John J. Reagan, *for appellant*.

Roetzel & Andress, LPA, Stephen W. Funk, Emily K. Anglewicz, and Anna Moore Carulas, *for appellees*.

EILEEN T. GALLAGHER, J.:

{¶ 1} Plaintiff-appellant, Bonnie G. Bromall, executor of the Estate of Paul S. Bromall, Jr. ("the Estate"), appeals from the jury verdict rendered in favor of defendants-appellees, Akron Nephrology Associates, Inc. ("Akron Nephrology"),

Americare Kidney Institute, L.L.C. ("Americare Kidney"), and Amr Al-Yafi, M.D. ("Dr. Al-Yafi") (together the "appellees"). The Estate raises the following assignments of error for review:

> 1. The trial court abused its discretion in failing to articulate its reasoning for excluding the testimony of three witnesses where defendants presented two reasons for doing so, one legal and one within the court's discretion, requiring speculation on appeal whether the trial court's exclusion would be reviewed de novo for error or an abuse of discretion.
>
> 2. If the trial court found that Dr. Raina's statements were hearsay and thus inadmissible under Evid.R. 802, it erred because the statements qualified as admissions against interest of a party opponent and were therefore admissible under Evid.R. 801(D)(2).
>
> 3. If the trial court found that Dr. Raina's statements were not hearsay, but the risk of unfair prejudice outweighed the statement's probative value, the trial court abused its discretion because the testimony was highly probative to the issues of fault and causation, and the defendants' criticism went solely to the weight of Dr. Raina's admissions.

{¶ 2} After careful review of the record and relevant case law, we affirm the jury's verdict in favor of the appellees.

## I. Procedural and Factual History

{¶ 3} On March 4, 2016, Paul S. Bromall ("Bromall"), age 62, was admitted to Akron General Health Systems ("Akron General") where he was treated for an infected ulcer on his ankle. Bromall had an extensive medical history, including diagnoses of "chronic kidney disease stage 4 secondary to diabetic nephropathy, diabetes mellitus type 2, hypertension, secondary hyperparathyroidism, anemia in chronic kidney disease, and morbid obesity." (Plaintiff's exhibit No. 1, pp. 481-482.) While at Akron General, Bromall was further diagnosed with paroxysmal atrial

fibrillation, congestive heart failure, cognitive impairment with incompetence for decision making, and progressive chronic kidney disease. (*Id.* at pp. 481-484, 519-520.)

{¶ 4} During his hospitalization, Bromall and his treating physicians engaged in extensive discussions concerning his deteriorating kidney function, the need for dialysis, and Bromall's eligibility for a kidney transplant. Ultimately, Bromall was started on hemodialysis following the implantation of a tunneled-dialysis catheter on March 14, 2016. The procedure required the use of sutures at the incision site. Pursuant to the instructional notes entered by the interventional radiologist, the sutures were to remain in place for 30 days.

{¶ 5} On March 22, 2016, Bromall was treated by Rupesh Raina, M.D. ("Dr. Raina"), an employee and partner at Akron Nephrology. Dr. Raina determined that the dialysis was improving Bromall's condition. However, Dr. Raina was concerned that it was premature to discharge Bromall for outpatient care. After speaking with Bromall's wife, who was worried she would not be able to transport Bromall to his outpatient dialysis appointments on her own, Dr. Raina decided it was necessary to refer Bromall to a rehabilitation facility. Once at the rehabilitation facility, Akron Nephrology would continue to manage Bromall's dialysis treatments and renal care.

{¶ 6} On March 23, 2016, Bromall was admitted to Select Specialty Hospital-Akron, L.L.C. ("SSHA"). While at SSHA, Bromall was under the primary care of attending physician, Atul Goswami, M.D. ("Dr. Goswami"). Bromall was also seen by an infectious disease specialist, as well as a number of nephrologists, including

Dr. Raina and practicing nephrologist, Dr. Al-Yafi. At the time Dr. Al-Yafi provided care in this matter, he was an employee of Americare Kidney. However, because Americare Kidney was in the process of acquiring Akron Nephrology, Dr. Al-Yafi was treating Akron Nephrology patients and assisting other Akron Nephrology doctors during the merger.

{¶ 7} On March 28, 2016, Dr. Al-Yafi removed Bromall's sutures from the catheter incision site. The following morning, a registered nurse discovered Bromall sitting up in bed with his dialysis catheter lying on the floor next to him. Bromall denied removing the catheter purposely and explained that he may have accidently caught the catheter on the sheets when he attempted to sit up in bed. Once notified, Dr. Al-Yafi immediately contacted Akron General and scheduled Bromall to have his permanent dialysis catheter replaced on Thursday, March 31, 2016, at 8:00 a.m., with dialysis to immediately follow. (Tr. 158, 282.) During this interim period, Bromall was unable to receive dialysis treatments. Dr. Al-Yafi's medical notes indicated that Bromall's potassium level was 5.1 millimoles per liter (mmol/L) on the date his catheter was accidently removed.

{¶ 8} On March 30, 2019, Bromall's potassium level rose to 6.0 mmol/L. Nurses at Akron Nephrology were instructed to notify on-call physicians of potassium levels that rise above 5.5 mmol/L based on the critical dangers associated with hyperkalemia. Despite Bromall's increased potassium level, Dr. Al-Yafi determined that Bromall's clinical condition did not indicate the need to change his treatment plan. Accordingly, Dr. Al-Yafi did not employ "urgent management"

treatments for hyperkalemia and did not attempt to move Bromall's catheter procedure to an earlier time.

{¶ 9} Before Bromall's catheter could be replaced, he was found unresponsive at approximately 3:12 a.m. on March 31, 2016. Despite resuscitative measures, Bromall was pronounced dead at approximately 3:55 a.m. on March 31, 2016. Blood drawn at 3:52 a.m. revealed that Bromall had a potassium level greater than 9.0 mmol/L. The attending physician certified on Bromall's death certificate that Bromall died as a result of cardiopulmonary arrest secondary to end stage renal disease.

{¶ 10} On March 27, 2018, the Estate filed a wrongful-death lawsuit against defendants SSHA, Select Medical Corporation ("SMC"), Akron Nephrology, Americare Kidney, Dr. Al-Yafi, Dr. Goswami, and Atul S. Goswami, M.D., Inc. ("AGI").[1] The complaint set forth a single cause of action for negligence, alleging that the defendants' deviations from acceptable standards of care were the proximate cause of Bromall's death, resulting in damages.

{¶ 11} Between June and October 2019, counsel for the Estate took the depositions of Akron Nephrology employees, Patricia Kaschner ("Kaschner"), Sharon White ("White"), Amanda Sims ("Sims"), and Dr. Raina.

{¶ 12} Relevant to this appeal, Kaschner testified she that is the decedent's sister, as well as a former medical assistant in the outpatient office of Akron

---

[1] On February 18, 2020, the Estate voluntarily dismissed SSHA and SMC from the lawsuit. On April 14, 2020, the Estate voluntarily dismissed Dr. Goswami and AGI from the lawsuit.

Nephrology. Kaschner stated that she was employed by Akron Nephrology at the time of Bromall's hospitalization. On Kaschner's first day back at work following Bromall's death, Dr. Raina consoled Kaschner in the office hallway and asked, "What happened? What happened? What happened to your brother?" (Kaschner depo. at 47.) At that time, Kaschner reported to Dr. Raina that Bromall had "pulled his catheter out and it was never put back in and when he finally passed away, his potassium was at 9.0." (Kaschner depo. at 7.) Kaschner testified that Dr. Raina apologized to her and stated, "[T]his is all Amr's [Dr. Al-Yafi] fault, this is all Amr's fault." (Kaschner depo. at 7.) Kaschner explained that she did not notify Dr. Raina that Bromall's potassium level of 9.0 derived from a measurement that occurred after Bromall "coded." (Kaschner depo. at 47.) Kaschner further testified that she did not believe Dr. Raina even knew Bromall had passed away before someone in the office mentioned it to him on the day Kaschner returned to work. (Kaschner depo. at 8.)

{¶ 13} White was deposed in June 2019. At her deposition, White testified that she was employed as a medical assistant for Akron Nephrology at the time of Bromall's hospitalization. White stated that following Bromall's death, Dr. Raina pulled her aside in the office and asked her how Kaschner was coping with her brother's death. White described their conversation as follows:

[Dr. Raina] said, "How is [Kaschner] doing?"

And I said, "Well, as well as can be expected," I said, "her brother passed away last night."

He proceeded to say, "I know. I know. This is all on Amr. This is all Amr's fault." He's referring to Amr Al-Yafi, Dr. Al-Yafi.

And I said, "Well, what do you mean?"

He was like, "It's all his fault. He killed [Kaschner]'s brother. He killed [Kaschner]'s brother."

It was like okay, you know, whatever.

He was like, "He should have been on dialysis. I had been giving him dialysis and Dr. Al-Yafi * * * did not dialyze him," he was like, "and that's what killed her brother."

(White depo. at 7-8.)

{¶ 14} White testified that she interpreted Dr. Raina's statements as "venting" and an attempt to place fault on Dr. Al-Yafi. She explained that Dr. Raina had a history of blaming others and that "it was a known fact that Dr. Raina did not like Dr. Al-Yafi." (White depo. at 19, 45.) Thus, White stated that she believed Dr. Raina was "trying to throw [Dr. Al-Yafi] under the bus because [he didn't] like him or [was] throwing him up under the bus to cover [himself]." (White depo. at 18-19.)

{¶ 15} Sims was deposed in October 2019. At the time of Bromall's hospitalization, Sims was employed as the lead-medical assistant for Akron Nephrology. Sims testified that following Bromall's death, Dr. Raina came to her office and asked if she had spoken with Kaschner about the circumstances of her brother's death. When Sims stated that she had not spoken with Kaschner, Dr. Raina responded, "Amr killed him." (Sims depo. at 8.) Sims testified that she was "shocked" by Dr. Raina's statement but did not report it to her supervisors because

she considered the conversations about Bromall's death to be "rumors." (Sims depo. at 61-63.)

{¶ 16} Dr. Raina was deposed in October 2019. Relevant to this appeal, Dr. Raina adamantly denied making any statements to Akron Nephrology employees suggesting that Dr. Al-Yafi was responsible for Bromall's death. He explained that he did not have any factual basis to express an opinion as to the standard of care rendered by Dr. Al-Yafi because he did not review Bromall's medical records or speak with anyone involved in the care rendered to Bromall following his last visit with Bromall on March 25, 2016. Thus, Dr. Raina denied reviewing Bromall's medical records after his death "to see whether or not there [was] something that was done wrong," and stated that he could "only talk about the one or two days when [he] took care of [Bromall]." (Dr. Raina depo. at 27-28.) Dr. Raina surmised that by offering his condolences about Bromall's passing, his statements may have been misinterpreted as an indication that Bromall's death was preventable.

{¶ 17} On August 17, 2021, the Estate filed a preemptive motion in limine, arguing that "it would be error to prevent the admission [of Dr. Raina's statements] into evidence in this case." Relying on the Tenth District's decision in *Pontius v. Riverside Radiology & Interventional Assocs.*, 2016-Ohio-1515, 49 N.E.3d 353 (10th Dist.), the Estate asserted that because Dr. Raina's statements were made within the course and scope of his partnership with Akron Nephrology, the statements were not hearsay because they constituted admissions of a party opponent under Evid.R. 801(D)(2).

{¶ 18} On August 18, 2021, appellees filed a cross-motion in limine, requesting the trial court to issue an order "precluding [the Estate] from presenting inadmissible hearsay testimony from lay witnesses who allege they overheard out-of-court opinions from non-party physicians." Appellees argued that the alleged statements of Dr. Raina "are clearly hearsay and, if permitted, would amount to the introduction of expert opinions that are unreliable and lack the requisite foundation required for expert testimony under the Rules of Evidence and Ohio law." Alternatively, appellees argued that the probative value of Dr. Raina's statements was substantially outweighed by the potential danger of unfair prejudice, confusion of the issues, or of misleading the jury.

{¶ 19} On September 7, 2021, the trial court issued separate journal entries, granting appellee's motion to preclude inadmissible hearsay testimony, while denying the Estate's motion in limine. The trial court did not articulate reasons supporting its judgment.

{¶ 20} The case proceeded to a jury trial on September 8, 2021. At trial, the Estate presented the expert testimony of Richard Huntley, M.D. ("Dr. Huntley"), a board-certified internal -medicine specialist, and Eric Brown, M.D. ("Dr. Brown"), a board-certified nephrologist. In the course of their expert evaluations, Dr. Huntley and Dr. Brown independently reviewed pertinent medical records and deposition testimony. Relevant to this appeal, each doctor explained their familiarity with the risks associated with elevated potassium levels. For instance, Dr. Huntley estimated that a patient's mortality rate "due to heart arrhythmias increases by 14 to 40

percent" once the potassium level exceeds 5.5 mmol/L. (Tr. 327.) Dr. Huntley and Dr. Brown further described the options that are available to physicians for the treatment of elevated potassium levels and the efficacy of these options had they been utilized by Dr. Al-Yafi in this case.

{¶ 21} On direct examination, Dr. Huntley testified that it was his opinion that Bromall died as a direct result of Dr. Al-Yafi's "deviat[ion] from the standard of care in his care and treatment of [Bromall.]" (Tr. 324.) In support of his opinion, Dr. Huntley noted that Bromall did not have a history of elevated potassium levels before he entered SSHA and that his heart function was deemed to be stable. Dr. Huntley further took exception with Dr. Al-Yafi's decision to remove Bromall's catheter sutures, noting that Dr. Al-Yafi's decision was contrary to the instructions of the interventional radiologist and led to the accidental removal of the catheter which, in turn, invited Bromall's elevated potassium levels. Moreover, Dr. Huntley criticized the decisions Dr. Al-Yafi made once it was apparent that Bromall's potassium levels were getting progressively higher. When discussing the treatments available to Dr. Al-Yafi, Dr. Huntley explained as follows:

> [Dr. Al-Yafi] could have done any of these things. He could have put the patient on a low potassium diet. He could have put in a temporary catheter in the ICU, which he testified in his deposition that he could have done, but he didn't. He could have done a temporary hemodialysis earlier than the 31st when the date was for a permanent catheter. He could have moved the patient to a monitored bed where there would be a running EKG strip that would be monitored by the nurse. He could have done an EKG. He could have given the patient Kayexalate * * * which is a resin that helps the GI secretion of potassium. He could have taken him off the losartan, which is a medicine that raises potassium.

(Tr. 344.) Because Dr. Huntley estimated that Bromall's potassium level was "higher than 6 and under 9 [mmol/L]" at the time of his cardiac arrest, Dr. Huntley characterized Bromall's death as foreseeable, yet avoidable. (Tr. 349, 352.) Dr. Huntley therefore concluded that "this was a preventable death that could have been avoided by doing the easy things." (Tr. 351.)

{¶ 22} Dr. Brown similarly opined that "[Dr. Al-Yafi] was negligent in his management of Bromall's hyperkalemia," and that Dr. Al-Yafi's deviation from the applicable standard of care "was the cause of the patient's death." (Tr. 403.) In support of his opinion that "Bromall's potassium was mismanaged," Dr. Brown explained that it was apparent from Bromall's laboratory reports that he was completely dependent on dialysis and that his kidneys were not functioning at the time his potassium levels rose above 6.0 mmol/L. Under this scenario, Dr. Brown testified that a reasonably careful nephrologist should have foreseen that Bromall's potassium levels would continue to rise in the absence of dialysis or emergency treatment. Dr. Brown testified that Bromall's condition warranted Dr. Al-Yafi to, at the very least, repeat a potassium measurement on March 30, 2016, to determine if it was necessary to take emergency measures, such as completing an electrocardiogram, prescribing Kayexalate, placing a temporary dialysis catheter, or arranging for the emergency placement of a permanent catheter. When asked to characterize the scope of Dr. Al-Yafi's failure to act, Dr. Brown stated, "Oh, I had to pick myself off the floor on this one, on not simply repeating the potassium the next day [March 30, 2016]." (Tr. 426.) Accordingly, Dr. Brown confirmed that (1) "[Dr.

Al-Yafi]'s failure to take any of the options that [were] listed for the jury, to a reasonable degree of medical certainty, constituted a deviation from the standard of care," and (2) "that deviation from the standard of care was a cause, to a reasonable degree of medical certainty of [Bromall's] death." (Tr. 445.)

{¶ 23} In lieu of a rebuttal expert witness, the defense called Dr. Al-Yafi to testify on his own behalf. Dr. Al-Yafi confirmed that he assisted Akron Nephrology in the renal care Bromall received during his stay in Akron General and SSHA. Specifically, Dr. Al-Yafi treated Bromall on March 7th, 12th, and 13th, during his stay in Akron General; and on March 26th, 28th, 29th, and 30th, during his stay in SSHA. Dr. Al-Yafi testified that Bromall suffered from "multiple comorbidities," including chronic-kidney disease, which "complicated" Bromall's treatment in this case. (Tr. 586-587.) Dr. Al-Yafi explained, for instance, that although Bromall was initially hospitalized due to an infected ulcer in his ankle, his worsening kidney function led to discussions about the need for dialysis. Although Bromall initially refused to accept dialysis, he ultimately agreed to undergo the tunnel-dialysis procedure to address concerns with fluid overload.

{¶ 24} Pertinent to this appeal, Dr. Al-Yafi testified that he was not aware of the instructions to not remove Bromall's catheter sutures for a period of 30 days. However, he explained that it was common practice to remove the sutures once the skin is healed, and that the skin sutures would not have prevented the catheter from being accidently removed given the force needed to remove a tunneled catheter. Dr. Al-Yafi further testified that he did not recall personally removing the sutures and

that it "was not part of [his] general practice to remove stitches." (Tr. 615.) Under these circumstances, Dr. Al-Yafi opined that "the fact that Mr. Bromall was left without a dialysis catheter on the morning of [Tuesday, March 29th,] [was not] due in any way to medical negligence." (Tr. 621.)

{¶ 25} With respect to the medical decisions rendered after Bromall's catheter was removed, Dr. Al-Yafi testified that it was reasonable to schedule the installation of the new tunneled-dialysis catheter to occur on March 31, 2016. He explained that Bromall was taking blood thinners at the time his catheter was removed, making it potentially dangerous to reinstall the catheter into a major blood vessel until Bromall's medications could be adjusted. In addition, Dr. Al-Yafi testified that he had no immediate concerns with Bromall's rising potassium levels between March 29th and March 30th because "it was not at [a] critical range." (Tr. 626.) Dr. Al-Yafi explained that, given the "clinical context" at issue in this case, a potassium level of 6.0 mmol/L was "not alarming * * * for a patient with a chronic kidney disease." (Tr. 626-628.) Dr. Al-Yafi further testified that he had reason to believe Bromall's potassium level would stay the same or lessen because (1) Bromall was already taking medications that reduce potassium levels, (2) Bromall had residual kidney function, and (3) Bromall had severe diarrhea that naturally reduced his potassium and sodium levels. Accordingly, Dr. Al-Yafi testified that he "felt safe that [Bromall] could proceed with [his] original plan" to install the tunneled dialysis catheter on the morning of March 31, 2016. (Tr. 628-629.)

{¶ 26} Based on the foregoing, Dr. Al-Yafi opined to reasonable degree of medical certainty that he was not negligent, provided Bromall reasonable and appropriate care, and was not the cause of Bromall's death. He further opined that the emergency procedures or treatments referenced by Dr. Huntley and Dr. Brown "were not indicated" under the clinical circumstances and that Bromall's potassium level of 9.0 mmol/L was "not reliable at all because it was [measured] 38 minutes after [his] arrest." (Tr.650-652 ,654.)

{¶ 27} At the conclusion of trial, the jury returned a verdict in favor of the appellees. Pursuant to their responses to the jury interrogatories, the jurors determined that Dr. Al-Yafi did not breach the standard of care.

{¶ 28} The Estate now brings this timely appeal.

## II. Law and Analysis

### A. Failure to Provide Reasons for Evidentiary Ruling

{¶ 29} In the first assignment of error, the Estate argues the trial court abused its discretion by failing to articulate its reasoning for excluding testimony of Dr. Raina's out-of-court statements. The Estate contends that "it is not clear if the court believed [the statements] were inadmissible hearsay under Evid.R. 802 or that the [statements'] potential for unfair prejudice outweighed its probative value as to require its exclusion under Evid.R. 403(A)." Thus, the Estate asks this court "to vacate the trial court's decision and remand this case with a mandate that the trial court articulate its reasons for excluding the evidence."

{¶ 30} After careful review of the record, we find the Estate failed to preserve the arguments posed within this assignment of error for the purposes of appeal. Regarding the motion in limine filed in this matter, it is well settled that

> [a]s a general rule, the grant or denial of a motion in limine is not a definitive ruling on the evidence. *State v. Grubb*, 28 Ohio St.3d 199, 200-201, 503 N.E.2d 142 (1986). Rather, it "is a tentative, interlocutory, precautionary ruling by the trial court." *Id.* at 201-202. Therefore, the grant of a motion in limine generally does not preserve any error for appellate review. *Id.* However, Evid.R. 103 was revised, effective July 1, 2017, to provide: "Once the court rules definitely on the record, either before or at trial, a party need not renew an objection or offer of proof to preserve a claim of error for appeal."

*Setters v. Durrani,* 2020-Ohio-6859, 164 N.E.3d 1159, ¶ 12 (1st Dist.).

{¶ 31} In this case, the trial court issued a judgment entry on September 7, 2021, rendering a final determination as to the admissibility of Dr. Raina's out-of-court statements. The trial court then reiterated its definitive ruling at the onset of trial and consistently rejected the Estate's efforts to proffer the disputed evidence at various stages of the trial. (Tr. 9-13; 116-118; 570-572.)

{¶ 32} Under the foregoing circumstances, there is no dispute that the Estate preserved its right to appeal the court's evidentiary ruling and resolution of the motion in limine. In contrast, however, the Estate did not object to the trial court's failure to articulate the legal basis supporting its evidentiary ruling. In this regard, it is well settled that "a party cannot raise new arguments and legal issues for the first time on appeal, and that failure to raise an issue before the trial court waives that issue for appellate purposes." *Miller v. Cardinal Care Mgt.*, 8th Dist. Cuyahoga No. 107730, 2019-Ohio-2826, ¶ 23, citing *Cleveland Town Ctr., L.L.C. v. Fin.*

*Exchange Co. of Ohio, Inc.*, 2017-Ohio-384, 83 N.E.3d 383, ¶ 28 (8th Dist.); *Kalish v. Trans World Airlines, Inc.*, 50 Ohio St.2d 73, 79, 362 N.E.2d 994 (1977) (Appellate courts "will not consider a question not presented, considered, or decided by a lower court."). And, although the Estate has not cited persuasive authority to support its position that the trial court was required to articulate the legal grounds supporting its judgment, there is nothing in the record to suggest it would have been futile for the Estate to seek clarification on the trial court's evidentiary ruling. Thus, we will not consider the arguments posed in this assignment of error for the first time on appeal.

{¶ 33} The first assignment of error is overruled.

### B. Evidentiary Rulings

{¶ 34} In the second assignment of error, the Estate argues that if the trial court found Dr. Raina's statements were hearsay and thus inadmissible under Evid.R. 802, it erred as a matter of law because the statements qualified as admissions of a party opponent under Evid.R. 801(D)(2). Alternatively, the Estate argues in the third assignment of error that if the trial court found Dr. Raina's statements were not hearsay, but that the risk of unfair prejudice outweighed the statement's probative value, the trial court abused its discretion because the statements were highly probative to the issues of fault and causation. We address these assignments of error together because they are related.

{¶ 35} Where, as here, the party has preserved the error for appellate review, we review a trial court's ruling on a motion in limine for abuse of discretion. *United*

*States Bank v. Amir*, 8th Dist. Cuyahoga No. 97438, 2012-Ohio-2772, ¶ 18, citing *Sokolovic v. Hamilton*, 195 Ohio App.3d 406, 2011-Ohio-4638, 960 N.E.2d 510 (8th Dist.). As discussed, the competing motions in limine filed in this case related to the admissibility of out-of-court statements allegedly made by Dr. Raina during his employment with Akron Nephrology. In this context, we recognize that, as a general matter, a trial court has wide discretion in the admission and exclusion of evidence. *Barton v. Cty. of Cuyahoga*, 8th Dist. Cuyahoga No. 109229, 2020-Ohio-6994, ¶ 23, citing *Beard v. Meridia Huron Hosp.*, 106 Ohio St.3d 237, 2005-Ohio-4787, 834 N.E.2d 323, ¶ 20. Thus, with the exception of evidentiary rulings that implicate the confrontation clause, appellate courts ordinarily review a trial court's hearsay ruling for an abuse of discretion. *State v. McKelton*, 148 Ohio St.3d 261, 2016-Ohio-5735, 70 N.E.3d 508, ¶ 97. An abuse of discretion connotes that the trial court's attitude was unreasonable, arbitrary, or unconscionable. *Ruwe v. Bd. of Twp. Trustees*, 29 Ohio St.3d 59, 61, 505 N.E.2d 957 (1987).

{¶ 36} We note, however, "that no court has the authority, within its discretion, to commit an error of law." *Dixon v. Huntington Natl. Bank*, 8th Dist. Cuyahoga No. 100572, 2014-Ohio-4079, ¶ 38, citing *State v. Beechler*, 2d Dist. Clark No. 09-CA-54, 2010-Ohio-1900, ¶ 70; *State v. Peterson*, 2013-Ohio-1807, 992 N.E.2d 425, ¶ 21 (10th Dist.); *see also Johnson v. Abdullah*, 166 Ohio St.3d 427, 2021-Ohio-3304, 187 N.E.3d 463, ¶ 39 ("We take this opportunity to make it clear that courts lack the discretion to make errors of law[.]"). We therefore review the decision of the trial court for abuse of discretion with the understanding that if the

trial court erred on a question of law, even with respect to an evidentiary issue, that such is an abuse of discretion. *See Herrera v. Phil Wha Chung*, 8th Dist. Cuyahoga No. 109793, 2021-Ohio-1728, ¶ 18 ("'On appeal, challenged hearsay is subject to de novo review under the applicable hearsay rule, rather than the more deferential review employed for discretionary rulings' because 'while there is discretion to admit or exclude relevant evidence, there is no discretion to admit hearsay.'"), quoting *LaBounty v. Big 3 Automotive*, 6th Dist. Ottawa No. OT-18-022, 2019-Ohio-1919, ¶ 42; *State v. Richcreek*, 196 Ohio App.3d 505, 2011-Ohio-4686, 964 N.E.2d 442, ¶ 29, 32 (6th Dist.), citing *State v. Sutorius*, 122 Ohio App.3d 1, 7, 701 N.E.2d 1 (1st Dist.1997), and *State v. Sorrels*, 71 Ohio App.3d 162, 165, 593 N.E.2d 313 (1st Dist.1991).

{¶ 37} Hearsay is defined as "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Evid.R. 801(C). Hearsay is inadmissible except under specifically delineated circumstances. Evid.R. 802.

{¶ 38} In this case, the Estate sought to introduce testimony by Kaschner, White, and Sims, to the effect that Dr. Raina believed, based on his familiarity with Bromall's medical history and diagnoses, that Dr. Al-Yafi and his principals were responsible for Bromall's death. There is no dispute that Dr. Raina's out-of-court statements were offered to prove the truth of the matter asserted. However, as applicable here, a statement is not hearsay "if the statement is offered against a party and is * * * a statement by the party's agent or servant concerning a matter within

the scope of the agency or employment, made during the existence of the relationship[.]" Evid.R. 801(D)(2)(d). Consequently, "[t]he statement of a party's agent or employee made in the course of employment concerning matters relating to such employment is admissible against such party." Staff Notes to Evid.R. 801(D)(2)(d).

{¶ 39} "'The pivotal inquiry for admission of a statement under Evid.R. 801(D)(2)(d) is whether the statement was made by an agent or employee of the party opponent, during the existence of the relationship, concerning a matter within the scope of the employment or agency.'" *Mowery v. Columbus*, 10th Dist. Franklin No. 05AP-266, 2006-Ohio-1153, ¶ 58, quoting *Davis v. Sun Refining & Marketing Co.*, 109 Ohio App.3d 42, 53, 671 N.E.2d 1049 (2d Dist.1996). In this case, the challenged statements were intended to be offered against the defendants in support of the Estate's claim that Akron Nephrology and its agents deviated from the applicable standard of care, resulting in Bromall's death. The disputed statements were made by Dr. Raina, who was a partner and acting nephrology specialist with Akron Nephrology at all relevant time periods. Thus, the statements were made "by the party's agent * * * during the existence of the relationship." The only remaining question then is whether Dr. Raina's statements "concern[ed] a matter within the scope of the agency or employment."

{¶ 40} In the context of whether a statement "concern[ed] a matter within the scope of the agency" it has been held, "[f]or a statement to qualify as an admission of a party-opponent, the agency relationship need not encompass

authority to make damaging statements but requires only the authority to take action concerning the subject matter of the statements." *Mowery* at ¶ 59, citing *Ball v. Consol. Rail Corp.*, 142 Ohio App.3d 748, 756, 756 N.E.2d 1280 (8th Dist.2001); *Pappas v. Middle Earth Condominium Assn.*, 963 F.2d 534, 538 (2d Cir.1992); *see also Sleeper v. Casto Mgmt. Servs.*, 10th Dist. Franklin No. 12AP-566, 2013-Ohio-3336, ¶ 17-18; Evid.R. 801(D)(2)(d).

{¶ 41} Generally, "[a]dmissions of liability against an employer, including statements of opinion regarding liability, are not within an employee's scope of employment and are therefore inadmissible under Evid.R. 801(D)(2)(d)." *Wulf v. Bravo Brio Restaurant Group, Inc.*, 2019-Ohio-3434,142 N.E.3d 123, ¶ 38 (12th Dist.), citing *Semco, Inc. v. Sims Bros., Inc.*, 3d Dist. Marion No. 9-12-62, 2013-Ohio-4109, ¶ 26. "However, factual assertions made by an employee within his or her knowledge and scope of employment are admissible." *Id.*; *Cordle v. Bravo Dev., Inc.*, 10th Dist. Franklin No. 06AP-256, 2006-Ohio-5693, ¶ 16.

{¶ 42} The party claiming admissibility under Evid.R. 801(D)(2)(d) bears the burden of showing that the statement concerned a matter within the scope of the declarant's employment. *Brock v. Gen. Elec. Co.*, 125 Ohio App.3d 403, 409-410, 708 N.E.2d 777 (1st Dist.1998). "Absent evidence that the statement concerned a matter within the scope of the declarant's duties, the statement is not admissible." *Pennisten v. Noel*, 4th Dist. Pike No. 01 CA669, 2002 Ohio App. LEXIS 759, 2 (Feb. 8, 2002), citing *Shumway v. Seaway Foodtown, Inc.*, 3d Dist. Crawford No. 3-97-17, 1998 Ohio App. LEXIS 1131 (Feb. 24, 1998).

{¶ 43} On appeal, the Estate argues that Dr. Raina's statements concerned matters within the scope of his employment with Akron Nephrology, particularly where he "(1) ordered Bromall's dialysis at [SSHA], (2) saw Bromall at [SSHA] days before his death, and (3) was a partner of defendant Akron Nephrology." In support of its position, the Estate relies on the Tenth District's decision in *Pontius v. Riverside Radiology & Interventional Assocs.*, 2016-Ohio-1515, 49 N.E.3d 353 (10th Dist.).

{¶ 44} In *Pontius*, the decedent was admitted to Riverside Methodist Hospital with complaints of abdominal pain and a history of deep-vein thrombosis and pulmonary embolism. The decedent had previously undergone surgery to install a filter in his vena cava to stop blood clots from entering his heart and lungs. Because of this history, a CT scan of the decedent's vena cava was taken by employees of Riverside Radiology to determine whether blood clots were present. During his stay at Riverside Methodist Hospital, a radiologist employed by Riverside Radiology reviewed the decedent's CT scan and determined that "the scan images were essentially normal." *Id*. at ¶ 2. The decedent was diagnosed with a possible urinary-tract infection and was discharged with medication. The following day, the decedent collapsed in the shower at home. An autopsy revealed the decedent died as a result of a pulmonary embolism.

{¶ 45} Following the decedent's death, his estate filed a malpractice lawsuit against the radiologist who read the CT scan, Riverside Radiology, and Riverside Methodist Hospital ("the defendants"). During the course of discovery, the

decedent's estate learned that Dr. Joseph Schultz, another radiologist employed by Riverside Radiology, had reviewed the decedent's CT scan following the decedent's death. According to a family friend of the decedent, Dr. Schultz later "revealed to him in confidence that the CT scan had indeed showed clots built up behind the vena cava filter and on the side of the filter." *Id.* at ¶ 6. Dr. Schultz further stated that the radiologist who had reviewed the CT scan "blew it" and that "[the decedent] should be here today." *Id.* The family friend repeated Dr. Schultz's statements during his deposition. However, Dr. Schultz denied ever stating that the scans showed blood clots.

{¶ 46} Prior to trial, the defendants filed a motion in limine, seeking the exclusion of Dr. Schultz's alleged statements on grounds that they constituted inadmissible hearsay under Evid.R. 802. The trial court granted the motion in limine and prevented the decedent's estate from introducing Dr. Schultz's statements at trial. The matter then proceeded to trial, and the jury returned a verdict in favor of the defendants.

{¶ 47} On appeal, the decedent's estate argued that the trial court "erred as a matter of law [by finding] the statements made by Dr. Schultz did not qualify as a party admission pursuant to Evid.R. 801(D)(2)." The Tenth District agreed, finding Dr. Schultz's statements concerning the presence of blood clots in the CT scan qualified as an admission of a party-opponent pursuant to Evid.R. 801(D)(2)(d). The *Pontius* Court reasoned that although Dr. Schultz's statements were offered in evidence to prove the truth of the matter asserted, the statements were offered

against a party-opponent and were made while Dr. Schultz was an employee of Riverside Radiology. In addition, the *Pontius* Court concluded that Dr. Schultz's statements concerned a matter within the scope of Dr. Schultz's employment, stating, in pertinent part:

> Dr. Schultz testified that he was with Riverside Radiology from 1977 to 2011 and was a part-time employee at the time of the decedent's death in 2009. At the relevant time he was board certified in radiology and licensed to practice medicine. His job duties included interpreting the whole panoply of radiology images including CT scans and also to peer-review the work of other radiologists to ensure quality. On this record * * * we find that comments by Dr. Schultz about CT scans he reviewed while at work, on his workstation, regarding a patient whose imaging had been evaluated by another doctor with Riverside Radiology, were statements made "concerning a matter within the scope of the agency or employment." Evid.R. 801(D)(2)(d). Although Dr. Schultz denied that his view of the CT scans of [the decedent] was an official review of the work in decedent's case, his testimony establishes that he was sometimes asked to review the work of other doctors, and, thus, such work was within the scope of his employment even if he lacked a specific directive from his employer to review the decedent's particular case.

*Id.* at ¶ 19. Finding the trial court's "evidentiary determination" was an abuse of discretion, the *Pontius* Court reversed the jury verdict and remanded the matter for a new trial.

{¶ 48} After careful consideration, we find *Pontius* to be distinguishable from the circumstances presented in this case. There is no dispute that Dr. Raina is a nephrology specialist who was authorized to monitor and facilitate medical care to Akron Nephrology patients, including Bromall. To this end, Dr. Raina was familiar with Bromall's diagnoses, facilitated his referral to SSHA, and was personally involved, albeit briefly, in the management of Bromall's renal care. Such care

included the facilitation of dialysis and the monitoring of Bromall's potassium and creatine levels. In addition, the disputed statements were made at Dr. Raina's place of employment and concerned the care provided by another doctor who was treating patients on behalf of Akron Nephrology.

{¶ 49} However, unlike the circumstances presented in *Pontius*, Dr. Raina's statements concerning the care provided by Dr. Al-Yafi were not "factual assertions" premised on his personal review of Bromall's medical records following the accidental removal of Bromall's catheter on March 29, 2016. Dr. Raina's last encounter with Bromall occurred on March 25, 2016, and at the time he made the disputed statements to his colleagues at Akron Nephrology, Dr. Raina had no knowledge of the circumstances that prevented Bromall from receiving dialysis between March 28, 2016, and March 31, 2016. In addition, Dr. Raina was not aware of Bromall's blood-work data in the days leading to his death or the factors that Dr. Al-Yafi weighed in determining that it was appropriate to proceed with the catheter replacement as scheduled. Thus, it is evident from this record that Dr. Raina's unsubstantiated opinions about the care Bromall received at SSHA was not based on objective facts gathered by Dr. Raina in the course of his employment. In contrast, the Akron Nephrology employees inferred that Dr. Raina's "venting" stemmed from circumstances unrelated to his job duties at Akron Nephrology, including Dr. Raina's personal feelings about Dr. Al-Yafi. (White depo. at 19.) ("[I]t was a known fact that Dr. Raina did not like Dr. Al-Yafi.")

{¶ 50} Moreover, unlike Dr. Schultz in *Pontius*, there is nothing in the record to suggest that Dr. Raina had the responsibility or authority to retroactively investigate and/or assess the medical decisions of other nephrologists to ensure quality. In fact, Dr. Raina testified at his deposition that he did not review Bromall's medical records or speak to anyone involved in Bromall's care following the removal of his catheter because it would have been unethical to do so. Dr. Raina explained that he was restricted from "going back and looking at Bromall's chart" or conducting an investigation on behalf of Akron Nephrology because:

> [t]hat's * * * a HIPAA violation. Unless you've been asked to review on the quality committee, but you cannot go to anybody's patient's charts to look at them.

(Dr. Raina depo. at 33.) Thus, Dr. Raina did not have the authority to take action concerning the subject matter of his alleged statements.

{¶ 51} Under the totality of these circumstances, we find the Estate failed to demonstrate that it was within the scope of Dr. Raina's employment, or his duties as a nephrologist with Akron Nephrology, to publicly perpetrate rumors about the medical care provided by other doctors in his office. As discussed, Dr. Raina's assertion that Bromall's death was "all Amr's fault" and that Dr. Al-Yafi "killed" Bromall constituted speculative opinions that were not dependent on objective or factual observations Dr. Raina gleaned while performing his duties as a nephrologist with Akron Nephrology. Because Dr. Raina's statements were not factual assertions within his knowledge, the statements were not admissible as admissions of a party-opponent under Evid.R. 801(D)(2)(d). It therefore follows that the trial court did

not abuse its discretion by granting the appellee's motion in limine and precluding the Estate from introducing Dr. Raina's out-of-court statements at trial.

{¶ 52} Nevertheless, even if this court were to conclude that the statements of Dr. Raina constituted admissions of a party-opponent, such a finding does not equate to a determination that the statements were admissible at trial. "Admissions of party-opponents, although not hearsay, are still subject to general rules of admissibility, including Evid.R. 401 and 403." *Mowery v. Columbus*, 10th Dist. Franklin No. 05AP-266, 2006-Ohio-1153, ¶ 62, citing *Boom v. Robinson*, 9th Dist. Summit No. 20314, 2001 Ohio App. LEXIS 3007 (July 5, 2001); *State v. Milligan*, 8th Dist. Cuyahoga No. 53630, 1988 Ohio App. LEXIS 1070 (Mar. 24, 1988).

{¶ 53} To be relevant and therefore admissible, evidence must have a tendency "to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Evid.R. 401. *See also Oakwood v. Makar*, 11 Ohio App.3d 46, 50, 463 N.E.2d 61 (8th Dist.1983). Even if the evidence is relevant, it must be excluded under Evid.R. 403(A) "if its probative value is substantially outweighed by the danger of unfair prejudice, of confusion of the issues, or of misleading the jury."

{¶ 54} Trial courts are afforded broad discretion in balancing the probative value of evidence against the danger of unfair prejudice to the defendant under Evid.R. 403(A). *See State v. Bethel*, 110 Ohio St.3d 416, 2006-Ohio-4853, 854 N.E.2d 150, ¶ 171. Consequently, we review the trial court's Evid.R. 403(A) determination under an abuse of discretion standard. *Id.*

{¶ 55} "In reaching a decision involving admissibility under Evid.R. 403(A), a trial court must engage in a balancing test to ascertain whether the probative value of the offered evidence outweighs its prejudicial effect." *State v. Wright*, 8th Dist. Cuyahoga No. 108026, 2019-Ohio-4460, ¶ 50, citing *State v. Maurer*, 15 Ohio St.3d 239, 473 N.E.2d 768 (1984), paragraph seven of the syllabus. In order for the evidence to be deemed inadmissible under Evid.R. 403, its "probative value must be minimal and the prejudice great." *State v. Morales*, 32 Ohio St.3d 252, 258, 513 N.E.2d 267 (1987). "When determining whether the relevance of evidence is outweighed by its prejudicial effects, the evidence is viewed in a light most favorable to the proponent, maximizing its probative value and minimizing any prejudicial effect to the party opposing admission." *State v. Lakes*, 2d Dist. Montgomery No. 21490, 2007-Ohio-325, ¶ 22.

{¶ 56} "Unfair prejudice does 'not mean the damage to a [party's] case that results from the legitimate probative force of the evidence; rather it refers to evidence which tends to suggest decision on an improper basis.'" *State v. Lang*, 129 Ohio St.3d 512, 2011-Ohio-4215, 954 N.E.2d 596, ¶ 89, quoting *United States v. Bonds*, 12 F.3d 540 (6th Cir.1993). "Unfair prejudice is that quality of evidence which might result in an improper basis for a jury decision." *Oberlin v. Akron Gen. Med. Ctr.*, 91 Ohio St.3d 169, 172, 743 N.E.2d 890 (2001). It is evidence that "'arouses the jury's emotional sympathies, evokes a sense of horror, or appeals to an instinct to punish'" and generally "'appeals to the jury's emotions rather than

intellect.'" *Id.*, quoting Weissenberger's Ohio Evidence, Section 403.3, at 85-87 (2000).

{¶ 57} Applying the foregoing principles to this case, we find the probative value of Dr. Raina's statements was substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury. As discussed, Dr. Raina is an experienced nephrology specialist, who testified about his familiarity with the role of the kidneys, the dangers of hyperkalemia, and the process of dialysis. Despite his clear medical expertise, however, Dr. Raina's statements in this case concerning the care provided by Dr. Al-Yafi were opinions or conclusions formed without a factual basis. As stated, Dr. Raina did not review Bromall's medical records or the pertinent laboratory data that was before Dr. Al-Yafi after Bromall's catheter was accidently removed. He therefore had no personal knowledge of the circumstances supporting Dr. Al-Yafi's determination that emergency methods to reduce Bromall's potassium levels before his catheter was replaced were "not indicated." Under these circumstances, the probative value of Dr. Raina's conjecture was minimal. Yet, had the trial court permitted the Estate to introduce Dr. Raina's unsubstantiated opinions at trial, it is probable that the jury would have been misled and accepted Dr. Raina's opinion as true, notwithstanding his lack of personal knowledge, based on his professional expertise, his familiarity with Dr. Al-Yafi, and his participation in Bromall's renal-care treatment. Because Dr. Raina's opinions went to the heart of the issues to be resolved by the jury, the risk of undue prejudice was great.

{¶ 58} Based on the foregoing, we find that the balancing analysis applied under Evid.R. 403(A) weighed in favor of exclusion of Dr. Raina's unsubstantiated opinions in the days following Bromall's death. Therefore, we find the trial court did not abuse its discretion in denying the Estate's request to introduce the evidence. Moreover, in light of the expert testimony offered by the Estate concerning whether Dr. Al-Yafi deviated from the standard of care and caused Bromall's death, we find the jury was presented with evidentiary alternatives that were based on a careful review of the relevant medical records, and therefore, had greater probative value. *See State v. Creech*, 150 Ohio St.3d 540, 2016-Ohio-8440, 84 N.E.3d 981, ¶ 22 ("Probative value is measured partially by the relative scarcity of evidence on the same issue.").

{¶ 59} The second and third assignments of error are overruled.

{¶ 60} Judgment affirmed.

It is ordered that appellees recover from appellant costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate be sent to the common pleas court to carry this judgment into execution.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

_____
EILEEN T. GALLAGHER, JUDGE

SEAN C. GALLAGHER, A.J., CONCURS (WITH SEPARATE CONCURRING OPINION ATTACHED);
MARY EILEEN KILBANE, J., DISSENTS (WITH SEPARATE DISSENTING OPINION ATTACHED).


SEAN C. GALLAGHER, A.J., CONCURRING:

{¶ 61} Although I concur with the majority's resolution of the assigned errors, the limitations of this particular appeal must be acknowledged. The arguments as presented in the three assigned errors are primarily based on conclusory statements without a complete discussion of the relevant law and applicable legal analysis. App.R. 16(A)(7).

{¶ 62} In the first assignment of error, the Estate provides no direct authority to support the claim that a trial court must provide a detailed rationale for its decision to exclude testimony; during the pretrial proceedings the appellees provided the trial court only three theories to exclude the evidence under Evid.R. 403, 702, and 802.[2] The matter was thoroughly briefed so that the arguments for and against are part of this appellate record, enabling our review under the standard

_____
[2] Despite the Estate's argument otherwise in the reply brief, the appellees included an argument challenging Dr. Raina's statements under Evid.R. 702 in the original motion in limine filed in advance of trial.

set forth by the majority. In the second assignment of error, after thoroughly explaining the Tenth District's decision in *Pontius v. Riverside Radiology & Interventional Assocs.*, 2016-Ohio-1515, 49 N.E.3d 353 (10th Dist.), the Estate offers a brief conclusion that the excluded statements of opinion were admissions of a party opponent under Evid.R. 802(D)(2) because the speaker was a partner of Akron Nephrology (addressing one part of the required analysis under the evidentiary rule) and that such error was not harmless; but neither conclusion provides an explanation as to how this case is controlled by the analysis in *Pontius*.[3] And the third assignment of error lacks any citations to authority to support the conclusion that Evid.R. 403 does not preclude the admission of the disputed statements.

{¶ 63} An appellant bears the burden of demonstrating reversible error, beyond providing conclusory statements. *In re 6011 Greenwich Windpark, L.L.C.*, 157 Ohio St.3d 235, 2019-Ohio-2406, 134 N.E.3d 1157, ¶ 33, citing *Toliver v. Vectren Energy Delivery of Ohio, Inc.*, 145 Ohio St.3d 346, 2015-Ohio-5055, 49 N.E.3d 1240, ¶ 30. The decision today must be read in the context of the arguments as presented. Nonetheless, I concur with the majority.

---

[3] In the reply brief, the Estate claims that Dr. Raina provided care to the patient and thus was speaking in the scope of his employment, but the record does not support that assertion. Dr. Raina had not participated in the care underlying the negligence allegations and had not reviewed any of the medical records for that treatment.

MARY EILEEN KILBANE, J., DISSENTING:

{¶ 64} I respectfully dissent from the majority opinion. I would find that Dr. Raina's statements were not hearsay but constituted admissions by a party opponent as defined in Evid.R. 801(D)(2)(d).

{¶ 65} I agree with the majority's conclusion that Dr. Raina's statements were made "by the party's agent [* * *] during the existence of the relationship." However, in contrast to the majority, I would find that Dr. Raina's statements concerned matters within the scope of his agency or employment rendering the statements admissible.

{¶ 66} According to the court in *Pontius v. Riverside Radiology & Interventional Assocs.*, 2016-Ohio-1515, 49 N.E.3d 353 (10th Dist.),

> [i]n the context of whether a statement "concern[ed] a matter within the scope of the agency" this court has previously held, "[f]or a statement to qualify as an admission of a party-opponent, the agency relationship need not encompass authority to make damaging statements but requires only the authority to take action concerning the subject matter of the statements." *Mowery v. Columbus*, 10th Dist. [Franklin] No. 05AP-266, 2006-Ohio-1153, [¶ 59], citing *Ball v. Consol. Rail Corp.*, 142 Ohio App. 3d 748, 756, 756 N.E.2d 1280 (8th Dist.2001); *Pappas v. Middle Earth Condominium [Assn.]*, 963 F.2d 534, 538 (2d Cir.1992); *see also Sleeper v. Casto [Mgt.] Servs.*, 10th Dist. [Franklin] No. 12AP-566, 2013-Ohio-3336, [¶ 17-18]; Evid.R. 801(D)(2)(d). Whether statements "concern[ed] a matter within the scope of the * * * employment," is not a matter of whether the employee was acting according to the direction of their employer in the moment that the statements were made, but rather whether the statements concerned "subject matter" upon which the employee had "authority to take action." *Mowery* at [¶ 58]; Evid.R. 801(D)(2)(d).

*Pontius* at ¶ 18. Additionally, the court may consider the content of the statement when determining the scope of an agent's authority. *Mowery* at ¶ 59.

{¶ 67} The majority determines that Dr. Raina's statements were equivalent to "unsubstantiated opinions." Yet, Dr. Raina treated Bromall on March 22, 2016, when he adjusted Bromall's dialysis schedule to three days a week and referred Bromall to SSH where Akron Nephrology, Dr. Raina's employer, could manage Bromall's dialysis treatments and renal care. Dr. Raina last treated Bromall on March 24, 2016. Bromall's treatment, including dialysis and renal care, were within the scope of Dr. Raina's duties. Dr. Raina had authority to facilitate care for Akron Nephrology patients, and I find this authority sufficient to establish Dr. Raina's statements were made in the scope of his employment.

{¶ 68} The instant medical malpractice claim contends that the defendants' negligence caused Bromall's untimely death. Thus, Dr. Raina's statements that Dr. Al-Yafi's actions or inactions precipitated Bromall's death presented relevant evidence. Evid.R. 401 ("evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence.") Relevant evidence is admissible unless "its probative value is substantially outweighed by the danger of unfair prejudice, of confusion of the issues, or of misleading the jury." Evid.R. 402 and 403(A).

{¶ 69} The probative value of the statements by Dr. Raina that Dr. Al-Yafi was responsible for Bromall's death substantially outweighed the danger of unfair prejudice, confusion of the issues, or misleading the jury. The testimony in question was probative as to negligence and causation and the credibility of Dr. Raina's

statements could have been addressed through the testimony of Kaschner, White, and Sims.

{¶ 70} The trial court's decision not to admit Dr. Raina's statements cannot be characterized as harmless error. The Estate presented two expert witnesses who testified that Dr. Al-Yafi's care constituted negligence. Dr. Al-Yafi testified his treatment of Bromall satisfied the standards of care. It seems unreasonable to conclude that the jury's deliberations would not have been impacted by Dr. Raina's statements that Dr. Al-Yafi's actions caused Bromall's death.

{¶ 71} Therefore, I would find that the trial court abused its discretion when it found Dr. Raina's statements inadmissible and, accordingly, I would reverse and remand the case for a new trial. For these reasons, I respectfully dissent.